ALBERTO CABRERA v. THE STATE

No. 4504. Decided F-bruary 3, 1909.

Rehearing Denied May 12, 1909.

**1.—Murder—Charge of Court—Circumstantial Evidence—Juxtaposition.**

Where upon trial for murder the evidence showed that the defendant was in such juxtaposition to the homicide as to exclude any other issue than that of positive testimony, a charge upon circumstantial evidence was not required. See opinion for facts which do not require a charge on circumstantial evidence. Ramsey, Judge, dissenting.

**2.—Same—Charge of Court—Express Malice.**

Where upon trial for murder the circumstances surrounding the case did not show that the charge of the court was not altogether pertinent to the facts, and simply illustrated what murder in the first degree is, there was no error in charging the jury that if the circumstances showed such general disregard of human life as necessarily included a formed design against the life of the person slain, the killing if it amounted to murder would be upon express malice.

**3.—Same—Charge of Court—Conspiracy.**

Where upon trial for murder the evidence showed that the defendant and another person were acting together in the commission of the homicide, any testimony going to show that they were present or were probably present, one or each of them or both, was germane, and there was no error in the court's refusal to charge that if the parties were not acquainted prior to the homicide to exclude the consideration of certain acts, conduct or conversation of said parties, prior to the homicide and on the ground that they were not material; the record showing that they were material.

**4.—Same—Evidence—Flight.**

Upon trial for murder there was no error in admitting testimony that the defendant was seen in jail in the Republic of Mexico some time after the homicide; besides such testimony could not prejudice the rights of the defendant.

**5.—Same—Charge of Court—Evidence—Bill of Exceptions—Extradition.**

Where upon trial for murder the defendant failed to except to the testimony introduced by the State that defendant while in the City of Mexico resisted extradition to the United States, the court did· not err in refusing defendant's special charge to meet his failure to except to the introduction of such testimony, to the effect that the jury could not consider the same.

**6.—Same—Charge of Court—Principals—Special Charge Refused—Intent— Circumstantial Evidence.**

Where upon trial for murder the evidence, among other things, showed that the defendant and his companion walked together up to the window of the room of a house where deceased, the only occupant, had retired for the night and was lying a few feet from the window, about midnight, and one of the two fired a shot into this room, (it not being shown that defendant fired such shot) and the deceased was found dead early the next morning at said place with a hole in his back made by a bullet evidently coming from a direct line of said window, etc., and the court charged fully on the law of principals as it applied to the facts, there was no error in the court's refusal of defendant's special charge that defendant could not be found guilty unless the State proved, by acts, etc., of defendant, the criminal intent of defendant at the time; or in failing to charge on circumstantial evidence.     Ramsey, Judge, dissenting.

**7.—Same—Charge of Court—Social Standing.**

Where upon trial for murder the testimony disclosed that the defendant was a Mexican and deceased a district judge, the court was not required to charge that the jury should not allow this fact to influence them in arriving at a verdict.

**8.—Same—Charge of Court—Evidence—Right to Bear Arms.**

Where upon trial for murder the State introduced testimony that on the morning after the homicide a large number of armed men, including the defendant, marched by the house where the body of the deceased lay, headed by a band of music, there was no error in the court's refusal to permit defendant to read a decision of this court that defendant was deputised to carry arms on the day after the homicide, or to charge the jury that the defendant had such right.

**9.—Same—Evidence—Range of Bullet.**

Upon trial for murder there was no error in permitting the State to introduce testimony that witnesses sighted—through the aperture where the slat was broken out of a shutter on the east window of the room, in which the deceased was sleeping and in which his body was found next morning—towards the body and wound of the deceased, said window being immediately behind said body; and this although said body had been removed and replaced.

**10.—Same—Evidence—Range of Bullet—Expert.**

Upon trial for murder there was no error in admitting testimony by the State of an expert witness showing the range of the bullet which killed the deceased; and the condition of the window blind through which the shot was supposed to have been fired, and all other circumstances surrounding the homicide.

**11.—Same—Conduct of · Prosecuting Attorney—Bill of Exceptions.**

Where upon appeal from a conviction of murder the qualification of the trial judge contradicted appellant's contention that the court permitted the district attorney to frighten and intimidate defendant's witness, there was no error.

**12.—Same—Evidence—Moral Turpitude of Witness.**

Where upon trial for murder it appeared that a State's witness had been

convicted of illicit retail liquor dealing and smuggling under the Federal Statute, neither of which offenses were felonies under the decision of the Supreme Court of the United States, said witness was not disqualified from testifying against defendant.

**13.—Same—Evidence—Impeachment of Witness.**

Where upon trial for murder the State's witness testimony was attacked by the defense's testimony to show that he had made a statement contradictory to that made on the trial, there was no error to permit the State to show that said witness had made the same statement before the trial.

**14.—Same—Evidence—Allusion to Defendant's Failure to Testify—Argument of Counsel.**

Where upon trial for murder a State's witness on cross-examination by defendant pointed to the defendant and remarked, "there he is, ask him!" and State's counsel alluded to said incident in his argument while impressing upon the jury the idea that said witness was honest and truthful, and the trial judge in his explanation to appellant's bill of exceptions certified that said counsel never referred to any matter that could be construed as an allusion to defendant's failure to testify, there was no reversible error, and the matter at the best was a mere inadvertence.

**15.—Same—Argument of Counsel.**

Where the argument of State's counsel, in the light of the explanation of the trial court, was legitimate, and simply a retort to the argument of appellant's counsel, there was no error.

**16.—Same—Misconduct of Jury.**

Where upon an appeal from a conviction of murder the record showed that the irregularities with reference to the conduct of the jurors were harmless to appellant and did not in any way jeopardize his rights or increase his punishment, there was no error.

**17.—Same—Murder in the First Degree—Sufficiency of the Evidence.**

Where upon trial for murder the evidence showed sufficiently that the defendant was one of the guilty participants in the assassination of the deceased, the verdict of murder in the first degree assessing life imprisonment is sustained.

Appeal from the District Court of DeWitt. Tried below before the Hon. James C. Wilson.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*R. B. Creager, A. I. Hudson, Lackey & Lewright* and *J. L. George,* for appellant.—It is not often that a case such as this arises, where both the commission of the act and the complicity of the appellant in such commission are shown by purely circumstantial evidence. In this case it is shown by positive evidence that either appellant or the man who accompanied him fired a shot near the scene where the body of the deceased was subsequently found, but it was not discovered that deceased had been killed until six or seven hours after said shot was heard to have been fired, and the fact, if it be a fact, that this shot was the one which killed deceased, is shown only by circumstantial evidence. There is absolutely no evidence in the record to show whether appellant or the man who was with him fired the shot; therefore, under the doc-

trine of reasonable doubt and the presumption of innocence, it is to be conclusively presumed that Sandoval fired the shot.

Upon this point we would suggest that, since it is absolutely in doubt as to which of the two fired the shot, the case is no stronger against this appellant than if the positive testimony had shown that Sandoval did the shooting.

What is there in this record to show the complicity of this appellant in the shooting by Sandoval? Absolutely nothing but circumstances. Ordinarily but one of these elements enter into the question as to whether or not a particular case is dependent upon circumstantial evidence. Ordinarily the only question in a case will be, Was the shot, or other act as to which there were eyewitnesses, the cause of the death of the deceased? Or, the death being shown by positive testimony to have been caused by one of several persons who were at the time together, was the accused acting with the individual who actually brought about the death?

In the case at bar we have both of these questions, and both depend for solution absolutely and entirely upon circumstantial evidence, and in order to remove this case from the realms of circumstantial evidence, not one, but both, of these questions must be settled by positive evidence, or circumstantial evidence so strong and so cogent as to make same amount to positive testimony.

In the Guerrero and Trejo cases, the defendant in each case acted alone, and was shown by the positive testimony at or near the scene of the crime, in a compromising attitude or position, and was so seen within a very few minutes after the act, and no question as to the complicity of the defendant with others in the commission of the crime enters into consideration in either of these cases. In each of these cases at the moment of the commission of the crime, appellant is found at the scene of the crime, and the corpus delicti is discovered at the time—not six or seven hours later, as in the case at bar. Yet in both of these cases this court reversed for the failure to charge upon circumstantial evidence. In the Burrell and Early cases we have illustrations of the other phases of this case, and in each of these latter cases the presence of the accused is shown by direct and positive testimony at the very time of the commission of the crime, and the only question in either case is as to the complicity of the defendant in the killing, the guilt of their codefendant having been shown by positive testimony; yet in these cases—though in both of them, and particularly in the Early case, the circumstances showing the complicity are far stronger than they are in this case—this court reversed both cases for the failure of the lower court to charge upon the law of circumstantial evidence.

We firmly believe, and earnestly insist that if this court, and each member of it, will carefully consider the evidence tending to show that the shot with reference to which Cayetano Pena and his

wife testify, was the shot which killed the deceased, they will not hold that these circumstances (for they are circumstances, and nothing but circumstances) are sufficiently strong to dispense with the necessity for a charge on circumstantial evidence where requested in the court below.

In each of the four cases to which we have just referred, the circumstances in evidence tending to show the guilt of the accused, are far stronger and more satisfactory than they are in the case at bar, and none of these cases had the double phase which this case presents. In all of the cases cited by the State in support of its contention, and referred to by this court in its opinion, there is not one wherein the circumstances were not infinitely stronger than they are in the case now before this court.

However, if this court should find that the circumstances in evidence were strong enough to amount to proof positive that this shot with reference to which the witness Pena and his wife testified, was the one which killed the deceased (and here again we desire in the most earnest manner positively to insist that they can not, in justice, so find), there remains the equally broad and equally important question as to this appellant's complicity in the firing of this shot, and upon this point the State makes a still weaker case of circumstantial evidence.

What are the circumstances in evidence, tending to show this complicity? First, and foremost, appellant's presence at the time the shot was fired, and following this some circumstances, such as his having been seen twice before on that same night in company with Sandoval; his having been seen coming from the direction in which the shot was heard in company with some other party (to the witness unknown) and carrying a rifle, and his being arrested in the City of Mexico.

Are these circumstances of such a strong and conclusive character, and do they tend so strongly to show his participancy in the act, as to deprive him of his right to a charge on circumstantial evidence? We do not believe it can ever be so held, especially in view of the undisputed facts in evidence tending to weaken these circumstances, as the fact that there is absolutely no motive shown on the part of appellant to commit the crime, that the State's main witnesses, themselves, testify that upon all of the occasions with reference to which they testify to seeing appellant, in approaching the window, in leaving it, upon meeting the witness Gonzales, his behavior was in every way natural and normal, he on all occasions walking in an upright manner, at an ordinary gait, with no effort at concealment and in the broad moonlight; the fact that the deceased, as shown by the undisputed testimony, was shot with a pistol and not with a rifle, the fact that appellant remained in Rio Grande City for a number of months after the homicide, and when he finally

left, bade his friends goodbye, telling them openly where he was going—we say, can these circumstances, weakened as they are by the facts we have recited, or even if they stood unweakened by such facts, be considered the equivalent of positive testimony to the fact of his guilty participancy in the commission of the crime?

The strongest of these circumstances tending to show the complicity of appellant is, of course, his presence at the time the shot was fired, but mere presence at the time of the commission of a crime has been repeatedly held of itself not to imply any criminality. Bare presence at the time and place of the commission of a crime, where it is not shown that the party took part in it, is held not to constitute one a principal, not alone by an unbroken line of decisions in this State, but by such writers as Roscoe in his "Criminal Evidence," Wharton in his "American Criminal Law" and Wharton in his "Law of Homicide." A clear and able discussion of this point is found in the Burrell case, where this language is used:

"To constitute the crime of which the evidence tends to convict him, there must be participation on his part in the act. If he is cognizant of the intention of this codefendant, and being present was consenting, and it was but the carrying out of a common design, he is guilty equally with him who committed the deed, and upon this subject the general principle is correctly stated in the charge of the court, but in order to implicate him in the crime he must have been aware of the intention of his companion to commit it. His bare presence is not sufficient for 'Although a man be present while a felony is committed, if he take no part in it and do not act in concert with those who commit it, he will not be a principal in the second degree merely because he did not endeavor to prevent the felony or apprehend the felon.' Roscoe Cr. Ev., 213; Whart. Am. Cr. L., 6364; Whart. L. Homicide, 157. Whether he was aware of the intention of his companion, and participated in it, was the fact to be proved in order to implicate him in the criminality of the act? That, as to him, was the *factum probandum* upon the proof of which his conviction must rest, and as to that the evidence was wholly circumstantial. There was no positive proof that he was aware of the intention of his companion or that he committed any overt act at the time manifesting a criminal intention on his part. His presence was not of itself sufficient to inculpate him; it was not per se evidence of guilt, or of any force as proof, only as considered with other circumstances, conducing to prove his guilt. It was not the main fact to be proved; for, of itself, it did not imply any criminality. But his presence and companionship, and his conduct at and before and after the commission of the act, were circumstances from which the main fact of his participancy in the criminal intention and design of his companion was to be inferred. It is plain therefore that as to his guilt, the evidence was wholly circumstantial."

In the Early case, the opinion and which was written by his Honor, Judge Brooks, a far stronger case of circumstantial evidence is made than in the one at bar, yet same was reversed for the failure of the court below to charge on circumstantial evidence. In that case (the Early case) it was shown by positive evidence that accused was at the scene of the homicide at the time same was committed; a motive was shown on the part of the defendant, his feeling toward deceased having been shown to be one of "malice, bitterness and hatred;" the hat-band of accused was found at the very scene of the struggle; he was armed with a knife such as the one with which the deceased was killed; flight is shown immediately following the homicide; yet, strong as these circumstances were, and in as close juxtaposition to the main fact as they placed the defendant (unquestionably infinitely closer and more convincing than in the case at bar) the Court of Criminal Appeals holds the failure of the court below to charge upon circumstantial evidence reversible error.

In the case at bar, as in the Early case, we have the presence of the accused at the scene of the homicide (though it was not shown except by circumstantial evidence that the homicide occurred while he was there), no malice against deceased on the part of appellant is shown in this case, nor any motive whatever on his part for the commission of the crime. No evidence (such as the finding of the hat-band) that he participated or assisted in the criminal act.

The error on the part of the court below in failing to charge upon circumstantial evidence in this case, was emphasized by his refusal to give appellant's special charge number ten, to the effect that the bare presence of a party at the place of the commission of a crime at the time of its commission, is not, in itself, sufficient to constitute him a principal, but that the jury must further find that he assisted or participated therein; but as the failure of the court below to give this charge has been discussed at some length under another assignment in the motion for a new trial we content ourselves with a simple reference to it here.

In concluding this argument, we desire to ask that the members of this court again read and consider the typewritten argument filed at the Tyler term when this case was first submitted on appeal, and to impress upon the court the fact that by laying special stress upon the questions we have discussed in this argument, we do not by any means desire to be understood as abandoning the other points raised in the motion for rehearing, particularly those with reference to the misconduct of the jury and the intemperate language used in the argument of counsel for the prosecution, and the reference by one of them to the failure of the defendant to testify.

*F. J. McCord,* Assistant Attorney-General; *Davidson & Bailey, F. W. Seabury* and *Jno. I. Kleiber,* District Attorney, for the State. —Cited cases in the opinion.

BROOKS, Judge.—Appellant was convicted of murder in the first degree and his punishment assessed at life imprisonment in the penitentiary.

Between twelve and one o'clock at night on November 5, 1906, in Rio Grande City, in Starr County, Judge Stanley Welch, district judge of that district, was assassinated in his room. The house in which he slept consisted of two rooms. Judge Welch occupied one and the district attorney the other. The homicide occurred on the night preceding an election. Judge Welch was at said city holding court at the time. Appellant and Jose Sandoval approached the window of Judge Welch's room where he was sleeping and remained standing there close together side by side for a short period of time. One of the two fired a shot into the house through the window where Judge Welch's body was found. He was shot from that point through the back. The evidence shows only one shot was fired in that neighborhood that night. The evidence shows that the wound that killed Judge Welch was fired from the window as indicated. Judge Welch's body was within four or five feet of the window inside of the room in the direction from which the shot was fired. Only one bullet hit the body. Cayetano Pena and his wife, Jesusa Gonzales de Pena, are the two witnesses who testified that they saw appellant and his codefendant fire the shot as above detailed. They furthermore testify they were sitting at their home some 120 feet away from Judge Welch's room and early in the night appellant and his codefendant passed by their house and they recognized them. Sometime thereafter, while they were still sitting, one in the door and the other on the bed looking out of the door in the direction of Judge Welch's window, they saw appellant and his co-companion approach and fire the fatal shot. They then saw them run away hurriedly from the window. They swore positively that it was appellant and his codefendant. If the testimony of the witnesses is to be believed as disclosed by this record the motive for the killing was political and appellant and his codefendant were the hired assassins of political enemies of Judge Welch, since there is nothing to suggest that appellant and his codefendant had any personal animus against the judge. No one knew that Judge Welch was killed until early the next morning, when the district attorney entered the room and found that he had been shot as suggested. Alarm was given, various parties gathered in, and after continued search appellant was sometime subsequently arrested in Old Mexico and brought back to this State on a proper requisition and tried for this homicide. The jury gave him murder in the first degree with life imprisonment. Pena and his wife testified that at the time that appellant and his codefendant passed their house, Judge Welch was sitting just inside of the east door of his room and there was a light burning in the room. Appellant and his codefendant passed on going to the north of the house in which

witnesses lived, then turned to the right and disappeared. Sometime after these parties passed, Judge Welch's light went out and his door was closed. About an hour after they passed the first time, the same two parties, coming from the same direction as before, walked up to the east window of the south room of Judge Welch's house and fired a shot. They did not know which fired the shot. There are other circumstances in the record that we do not deem necessary at this time to rehearse.

Appellant's first ground of his motion for a new trial complains that the court erred in failing to charge on circumstantial evidence. To support his contention he cites us to the following authorities: Early v. State, 50 Texas Crim. Rep., 344, 97 S. W. Rep., 82; Guerrero v. State, 46 Texas Crim. Rep., 445, 80 S. W. Rep., 1001; Trejo v. State, 45 Texas Crim. Rep., 127, 74 S. W. Rep., 546; Poston v. State, 35 S. W. Rep., 656; Leftwich v. State, 34 Texas Crim. Rep., 489, 31 S. W. Rep., 385; Polanka v. State, 33 Texas Crim. Rep., 634, 28 S. W. Rep., 541; Montgomery v. State, 20 S. W. Rep., 926; Deaton v. State, 13 S. W. Rep., 1009; Puryear v. State, 28 Texas Crim. App., 73, 11 S. W. Rep., 929; Beason v. State, 43 Texas Crim. Rep., 442, 67 S. W. Rep., 96. The case of Puryear v. State, supra, and other authorities noted by appellant do not sustain his contention. There is a long line of authorities in this State, holding that where the defendant is in such juxtaposition to the crime committed, as the facts in this case show, that a charge upon circumstantial evidence is not required.

The latest case that our attention has been called to, sustaining this modification, is the case of Dobbs v. State, 51 Texas Crim. Rep., 629. In discussing the question as to whether the issue of circumstantial evidence was presented in that case, we used this language: "The State's testimony shows that a witness a couple of hundred yards away heard a gun fire at the spot where deceased was subsequently found, and in a few moments saw appellant and his son (his son having a gun) coming from the direction of where the deceased was subsequently found. The witness walked up the road in company with another witness and discovered deceased lying on the ground shot, and these facts place appellant in such juxtaposition of the crime, of themselves from the State's standpoint, so as to preclude the issue of circumstantial evidence." So we have in this case the parties thoroughly identified as being the parties who fired the shot that killed the deceased. There was no one else in the room or that slept in the room. So we hold that the court did not err in failing to charge on the issue of circumstantial evidence. In passing upon this case on the question of habeas corpus as reported in 53 Texas Crim. Rep., 466, 110 S. W. Rep., 898, we there stated that "The testimony for the State is positive and unequivocal that relator, in company with another, killed the deceased by shooting him through a window at night," and we

meant by that statement evidently that the facts placed appellant in such juxtaposition to the crime as to exclude any other issue than that of positive testimony. The State in its brief, in addition to the Dobbs case, supra, cites as also pertinently bearing on this question the following authorities: Keith v. State, 50 Texas Crim. Rep., 63; Kidwell v. State, 35 Texas Crim. Rep., 264; Hollan v. State, 45 Texas Crim. Rep., 172; Beason v. State, 43 Texas Crim. Rep., 442; Polk v. State, 35 Texas Crim. Rep., 495; Adams v. State, 34 Texas Crim. Rep., 470; Baldwin v. State, 31 Texas Crim. Rep., 589; Crows v. State, 34 Texas Crim. Rep., 533; Bennett v. State, 32 Texas Crim. Rep., 216; Hardin v. State, 8 Texas Crim. App., 653.

The fourth assignment of error complains of the following charge: "Do the facts and circumstances in this case show such a general disregard of human life as necessarily includes the formed design against the life of the person slain. If so, the killing, if it amounted to murder, will be upon express malice." Appellant insists that said charge is erroneous, because it instructed the jury as to a phase of the law and as to an issue not raised by the evidence in this case, and for the further reason that said portion of the court's charge was calculated to lead the jury to believe, and did lead the jury to believe, that in the opinion of the court this defendant was a dangerous and reckless person. This is simply an illustration used by the court to get the jury to understand what murder in the first degree is. Furthermore, the circumstances surrounding this case to our minds, do not show that the charge was not altogether pertinent to the facts. There is no error in the charge.

Appellant insists the court erred in refusing the following charge: "That there is no evidence before you showing or tending to show that the defendant ever saw or knew Jose Sandoval prior to and at the time of eleven o'clock p. m. of November 5, 1906; therefore, you are instructed that any act, acts, conduct or conversation of or with said Sandoval prior to said time of eleven o'clock p. m. of November 5, 1906, can not be considered by you in this case as in any way tending to criminate the defendant on trial herein." And in this connection appellant further complains that the court erred in failing to give the following charge: "That the testimony of Rufino Clark, Francisco Martinez and Rafael Moreno was admitted before you upon the statement of the State's counsel that the materiality thereof would be subsequently shown, but inasmuch as this has not been done, the court now instructs you that you will not consider for any purpose the evidence of either or all of said witnesses as to the whereabouts of Jose Sandoval, or his statements, acts or conduct, or as to the statements made to him by Gregorio Duffy or any other person, or to any message sent to him or received by him on said night (if they were sent or received by

him); said evidence must not be considered by you for any purpose whatever; and it is your duty as jurors to wholly disregard the same, exclude it from your minds, and try this case as though you had never heard it." The record shows that the court permitted Rafael Moreno to testify for the State that he was overtaken on the night of November 5, 1906, by Jose Sandoval, while riding on the road from Roma to Rio Grande City, at or about nine p. m., and that he rode with said Sandoval about a league in the direction of Rio Grande City; that he conversed with Sandoval, and that said Sandoval then left the witness and rode on ahead toward Rio Grande City. It is shown by Rufino Clark that he saw Sandoval at a ranch five miles below Roma, in Starr County, and on the road leading from Roma to Rio Grande City. This testimony was entirely germane and pertinent. The evidence for the State shows that the parties were acting together in the commission of this murder, and any evidence going to show that they were present or were probably present, one or each of them, or both, was germane and pertinent, and it follows, therefore, that the court did not err in refusing the above quoted charges. Where two or more parties act together any acts or declarations prior to the consummation of a crime that will illustrate the purpose and animus or probable co-operation of the parties in the commission of the crime, are admissible. The sheer fact that there was no testimony showing that the parties were acquainted prior to the night of the homicide, does not show that they did not act together. If they met for the first time on the night of the homicide, the testimony that he was going to where he met appellant would be clearly admissible. It would be only a circumstance to be argued to the jury to indicate that they did not.

The trial court permitted the district attorney, John I. Kleiber, to testify for the State that while he was in the city of Mexico, he saw this defendant incarcerated in the general jail in said city. Appellant objected to this testimony as shown by bill of exception No. 4 on the ground that same was irrelevant, immaterial and prejudicial to the rights of this defendant; and upon the further ground that it was not competent nor proper for the State to prove that this defendant had been in jail for this or any other offense. It was proper for the court to permit this testimony. It is a circumstance to show flight, or at any rate it could not prejudice the rights of appellant to prove that he was in jail charged with this crime.

The 12th error complained of was the refusal of the court to give special charge No. 3 asked by appellant, which is as follows: "Gentlemen of the jury: You are instructed at the request of the defendant as follows, to wit: That the fact (if it is a fact) that the defendant was extradited from the Republic of Mexico, or the fact that he did or did not undertake to defeat said extradition by

legal process or otherwise, can not be considered by you in this case, as in any way tending to incriminate this defendant. Every citizen has a right to appear before the proper officials and defend himself in an extradition proceeding, and the fact that he does so is not and can not be considered by you, as a fact or circumstance showing or tending to show his guilt or innocence, as to the crime with which he stands charged." It is contended that the court was in error in refusing this, because evidence was introduced to show that appellant while in the city of Mexico fought the extradition from the United States and resisted being returned from the asylum country. He asserts in the statement in his brief that exception was reserved to this testimony in his bill of exceptions No. 3 found on pages 31 and 32 of the transcript. An inspection of that bill does not verify this contention. There is nothing in the bill indicating that appellant fought extradition. The exception was reserved to the statement of district attorney Kleiber that he went to the city of Mexico on business connected with extradition of the defendant and there the bill ends so far as this phase of the testimony is concerned. It may be conceded, so far as this charge is concerned, that testimony was introduced that appellant fought the extradition, but in order to take advantage of this the defendant must object to the introduction of this testimony, and if the court overruled the objection appellant should have properly reserved his bill of exceptions, but this was not done, nor was a motion made to exclude the testimony subsequently. We find no bill of exception was reserved, but appellant seeks to use a special charge to meet his failure to except to the introduction of it. This can not be done. A charge can not be used to serve the office of a bill of exception in regard to the admission or rejection of evidence. Pippin v. State, 9 Texas Crim. App., 269; Thomas v. State, 16 Texas Crim. App., 535; Capps v. State, 40 Texas Crim. Rep., 103; Nall v. Gates, 20 Texas, 315; Lanham v. State, 7 Texas Crim. App., 126; Bohanan v. Hans, 26 Texas, 445. We therefore hold that a requested instruction can not take the place of a bill of exception in regard to testimony illegally introduced or rejected. The authorities cited by appellant, notably the case from Missouri, are not in point inasmuch as the question is not properly before the court. There having been no bill of exception reserved to the introduction of this testimony, it can not be raised by a special charge. Therefore, the following authorities relied upon by appellant, Johnson v. State, 76 S. W. Rep., 925; Rogers v. State, 44 Texas Crim Rep., 350, 71 S. W. Rep., 18; Weaver v. State, 43 Texas Crim. Rep., 340, 65 S. W. Rep., 534, are not in point.

The 15th assignment of error complains of the failure of the court to give the following charge: "That the mere presence of the defendant at the time and place of the killing, if he was present, would not justify you in finding him guilty of the offense charged,

unless the State has satisfied your minds by competent evidence, and beyond reasonable doubt, that he (the defendant) knowing the unlawful intent of the party committing the act, aided him by acts or encouraged him by words or acts to commit such offense. And it would devolve upon the State to prove such acts by competent evidence, beyond a reasonable doubt, before you can convict defendant upon such evidence." The charge on principals in this case was very full. It covered every possible phase required under the law of this State. It told the jury in clear and succinct language that they must believe beyond a reasonable doubt that the parties were acting together at the time of the commission of the offense, and it was not necessary. Furthermore, there was no testimony that parties were not acting together.

Appellant insists the court should have charged the jury that they must not allow the fact that he is a Mexican to influence them in arriving at a verdict. There is nothing suggested in this record to require such a charge. Or à charge to the effect that they must not consider the bare fact that the deceased was a district judge.

The 17th and 18th assignments of error complain that the court erred in refusing to permit appellant to read a decision of this court, in the case of Francisco Gonzales, which shows that Jose Pena had authority to commission men to carry arms, and, further, to show that he had deputized appellant to carry arms on the day after the homicide. It seems that the State proved that on the morning of the 6th after the homicide and after the discovery of Judge Welch's dead body a large number of men, marching in file and headed by a band of music marched by and stopped in front of the house of the deceased, and that said men were accompanied by a number of armed men carrying rifles or Winchesters and pistols. Appellant insists that this testimony was calculated to impress the jury that the parties were unlawfully armed, and that this defendant was one of the parties. It was pertinent for the State to show that appellant, in company with others, was armed the next day following the homicide. The court admitted testimony to the effect that appellant was legally carrying arms in order to rebut the presumption created by the State's evidence, but we do not think a decision of this court holding that one Pena was authorized to issue a commission to bear arms was admissible under any view of the case. Nor do we think the testimony of sufficient moment to require the court to tell the jury that appellant had a legal right to bear arms on the day after the homicide.

The 22d and 23d assignments of error complain that the court erred in permitting John I. Kleiber to testify for the State, in substance and effect, that during the next day after the commission of the homicide, he sighted through the aperture where the slat was broken out of the shutter on the east window of the room in

which the deceased was sleeping and in which the body was found, on the morning of November 6, 1906, towards the body and wound of the deceased, and that the east window of said room was immediately behind the body of Judge Welch and immediately behind the hole in the back of said body. This testimony was admissible. The testimony of Dawson to the same effect was also admissible. The fact that the body had been removed and replaced would only go to the weight of the testimony.

The 24th assignment of error complains that the court erred in permitting the witness Dawson to testify for the State that the bullet which killed the deceased entered in the back near the right shoulder blade, and that the point of exit was the wound in front of the body, on the left breast. The bill shows the witness was an expert on gunshot wounds, and there was no error in admitting his testimony. The testimony of the witnesses as to the condition of the window blind and all other circumstances surrounding this homicide were admissible.

Bill of exception No. 14 complains that the court erred in permitting the district attorney to frighten and intimidate the witness Rafael Moreno. The qualification contradicts this contention.

The 31st error complains that the court erred in admitting before the jury the testimony of Cayetano Pena, a State's witness, over the objection of appellant, and upon the defendant's challenge as to the competency of said Cayetano Pena as a witness herein, it being shown by uncontroverted evidence introduced by defendant at the time said witness was offered by the State that he had twice been convicted in the United States District Court at Brownsville, Texas, of felonies, to wit: the crime of illicit retail liquor dealing, and the crime of receiving and concealing smuggled property, both in violation of the Federal Statutes for such cases made and provided, and introduced in evidence. Under the United States Statutes defendant might legally be punished by confinement in the penitentiary for a term greater than one year in duration, appellant urging the incompetency of said witness under the terms of section 3, of article 768, of the Code of Criminal Procedure of Texas. In the case of Reagan v. United States, 157 U. S., 301; Barron v. United States, 156 U. S., 495; Ex parte Wilson v. U. S., 114 U. S., 417; Mackin v. United States, 117 U. S., 348, it was held that the offense of which appellant was convicted is not a felony. In the case of Pitner v. State, 23 Texas Crim. App., 366, in passing upon a similar question, we held that the defense, in order to make the judgment available for the purpose of disqualifying the State's witness, should have proved by the law of Kansas that forgery was a felony. We therefore hold that the witness was not disqualified to testify since, according to the Federal decisions the offense of which he was convicted was not a felony and could not come within

the terms of the statute invoked by appellant to disqualify him from testifying.

The 33d error complains that the court erred in permitting Cayetano Pena to testify for the State that he told his son-in-law, Pancho Trevinio, in April, 1907, what he (Pena) claims to have seen and heard on the night of November 5, 1906, pertaining to the murder of Judge Welch as shown by bill of exceptions No. 21. This testimony was objected to by appellant on the ground that it was irrelevant, immaterial and hearsay. Furthermore, that said Pena had not been impeached by any other witnesses at the time he was allowed thus to testify. But the record and bill does show that he was impeached by proving contradictory statements to the one sworn to in the trial of this case. Therefore, it was permissible to prove what he told his son-in-law.

The 34th and 35th assignments show the following: While the witness Jose Maria Gonzales, a witness for the State, was testifying, on cross-examination by defendant, in reply to a question, the witness stated: "There he is, ask him," pointing to the defendant at the time he made said remark. From this circumstance Mr. Seabury, counsel for the State, in his argument to the jury, undertook to impress upon the jury the idea that said witness Gonzales was an honest and truthful man, as shown by the remarks made by him, and his pointing at the defendant. The defendant said that said argument and conduct of said Seabury constituted and were in fact an indirect but exceedingly harmful allusion to the failure of this defendant to testify herein in his own behalf. The bill of exceptions in reference to the matters presents it as follows: While the witness was on cross-examination he was asked: "Q. What were the first words Cabrera spoke to you? A. In what direction was the shot? Q. What did you reply? A. I told him it was that way (indicating). Q. Is that all you said, just 'that way?' A. Yes, sir, towards the courthouse. Q. Did you mention his name? A. No, sir. Q. Are you sure those are exactly the words he used? A. Yes, sir. Q. Then what did you reply to that? A. I told him, 'No, it was towards that way.' Q. Is that all you said? A. That is what I told him. Q. You are sure that is all you said? A. Yes, sir. Q. Then what did he reply? A. He said, 'We were drinking coffee when I heard the shot, and I do not know in what direction it was.' Q. He had just told you what direction he thought it was, had he not? A. Yes, sir. Q. Then he turned around and told you that he had been drinking coffee and did not know in what direction it was? A. Yes, sir; you can ask him, he is there present (indicating the defendant). Q. Did any other words at all pass between you at that time? A. No, sir. Q. Are you sure the words you have given here under oath are the exact words that passed? A. Yes, sir." During the discussion of the above facts by Mr. Seabury he referred to this incident in the trial of the case which had been

brought out by examination of appellant's counsel; whereupon an objection was immediately made that appellant had not testified, and the court passing upon this matter endorsed upon the bill of exceptions a complete and full statement of the facts and stated in his explanation attached to the bill that Mr. Seabury never referred to any matter that could be construed as intimating to the jury anything about appellant not having testified. In the light of the explanation of the court we can not hold it was an allusion to defendant's failure to testify. The bill is quite long and we have copied same as full as the length of this opinion will justify. There appears to have been no protest at the time the witness made the statement on the part of the defense counsel. The witness replies, "Yes, sir, there he is, you can ask him," but appellant's counsel never protested against it, and the attorney inadvertently repeated what the witness stated. We can not say that this violates the statute invoked in this case.

There is a long bill of exceptions in this record complaining of the argument of Hon. A. B. Davidson. In the light of the explanation of the court the argument was legitimate, or at least was a retort upon the argument made by appellant's counsel and provoked by them.

The 39th error complains of the misconduct of the jury in this: After the jury had heard part of the argument in this case, but before said argument was finished, and before the jury received the charge of the court herein, one Charles Lenz approached H. C. Huebotter, who was then and there a duly empaneled and sworn juror in this case, at or near the restaurant of said Lenz in the city of Cuero, Texas, and stated to said Huebotter that he (Lenz) had received a telephone message to the effect that said Huebotter's horse had run away with his buggy, in which his (Huebotter's) children were riding, and had torn up the buggy, and that the horse was badly cut up by barbed wire, but his children were not hurt, and for him not to be uneasy. Attached to the bill presenting this matter is the affidavit of the juror, but the district judge found as a matter of fact that said affidavit was untrue and the juror trying this case was in no way influenced by what occurred and the juror Huebotter had stated facts not true, and that the verdict of the jury was in no way affected by what occurred in the jury room nor what occurred in the presence of Mr. Lenz. To present these matters in detail would be unnecessary, since after a very careful reading of same we hold that the irregularities complained of were harmless to defendant and did not in any way jeopardize his rights or increase his punishment, pains or penalties. Other misconduct of the jury complained of by appellant has also been reviewed by us and we find no ground for reversal of the judgment by reason of such misconduct.

We have discussed with much candor and detail all the assign-

ments of error raised by appellant in this very voluminous record covering in all nearly one thousand pages, and feel constrained to say that a verdict in consonance with justice and with law and the procedure of this State has been secured. The record clearly shows that appellant, in conjunction with his codefendant, acting as a cowardly tool of a lot of political assassins killed the district judge of his district. That the evidence is as clear and cogent as it might be can not be said, but that it is sufficiently convincing to show to any fair mind that the appellant was one of the guilty participants in the assassination, we take it there can be no cavil about.

So believing and· so finding the record, the judgment is in all things affirmed.

RAMSEY, JUDGE.—I am not prepared to agree to the judgment of affirmance. It seems to me that the court should have charged the law of circumstantial evidence. Again, I am inclined to think that the special charge No. 10 requested by appellant's counsel should have been given. Nor am I sure there are not other errors in the record. I may write my views later.

ON REHEARING.

May 12, 1909.

BROOKS, JUDGE.—This case was affirmed at the recent Dallas Term, and now comes before us on motion for rehearing.

The first ground of the motion is that this court erred in finding, as a matter of fact, that Cayetano Pena and his wife testified that they "saw appellant and codefendant fire the shot" alleged to have killed the deceased. If appellant's counsel had construed the opinion as a whole, as all opinions must be construed, they would have seen that this criticism was both gratuitously incorrect, since it will be shown by a reading of the opinion that the following statement is therein made, to wit: "Judge Welch was at said city holding court at the time. Appellant and Jose Sandoval approached the window of Judge Welch's room where he was sleeping and remained standing there close together side by side for a short period of time. One of the two fired a shot into the house through the window where Judge Welch's body was found. He was shot from that point through the back." Further along in said opinion will be found the following statement: "Only one bullet hit the body. Cayetano Pena and his wife, Jesusa Gonzales de Pena, are the two witnesses who testified that they saw appellant and his codefendant fire the shot as above detailed." Further along in said opinion appears the following: "They saw appellant and his co-companion approach and fire the fatal shot." The latter statement when construed in the light of the two previous statements show that ap-

pellant's criticism is hypercritical, since this court never attempted to say, nor does it now understand, the record to be that appellant himself fired the shot that killed the deceased, but the evidence does conclusively establish the fact out of the mouth of the two above named witnesses that appellant in direct co-operation with Sandoval was present when the shot was fired that killed the deceased through the window about twelve o'clock at night, and they either walked or ran away together after said shot. It is immaterial whether they ran or walked away. They left. They were at the house at an unseemly hour. They had previously approached the house and seeing deceased sitting in his door disappeared, and a short while after deceased's light was blown out or turned out, then they approached the window, as stated, and fired a shot into the back of the deceased, according to the testimony in this record. The witnesses did not say, nor does the opinion of this court say, that the witnesses stated which one of the two defendants fired the shot, nor does it matter under the law of principals which one fired the shot. Appellant further insists that both of the State's witnesses testified that they did not see any weapon whatever in the possession of either appellant or Sandoval, upon either of the occasions testified to by said witnesses; moreover, said witnesses testified that they did not see the flash of any pistol or rifle shot at the time they claim to have heard the shot fired by either appellant or Sandoval. The testimony of the witness Cayetano Pena, found on page 492 of the statement of facts, in reference to the immediate facts of the shooting, is as follows: After testifying that he saw appellant and Sandoval together a short while before the killing, he then testified as follows: "The second time that I saw these two men come by my house that night, they were going this way (indicating by reference to map). This is the corner of my house, and this is the house of the judge (indicating); when I saw these two men there the second time that night, they went this way (indicating) to the window of the judge's room. After they got to the window and the shot was fired, they went this way (indicating by reference to map). I did not see any pistol or gun on either of these two men when they passed my house either time that night. When the shot was fired I did not remain sitting in the door. I went to the window; I went to the window in that same house of mine. After I had opened the window my wife stood at my back behind me. My window there had a blind on it. When I went to the window the blinds were shut. When I got to the window I opened it, opened one of the shutters. When they fired the shot I was at the door. At the time I saw them go to the corner of the priest's yard, the wall. I was at the window. When these two men left the corner of the house in which I lived and went to the window of Judge Welch, they went in a natural walk side by side. Before they fired the shot, they remained at Judge Welch's window very little, hardly any time,

and they just stood there a few moments after they fired the shot."
Furthermore, the witness testified: "The window into which I saw
this shot fired was the first window on the part towards the river.
After the shot was fired they went steadily away; they went in an
ordinary pace, that is what I saw, that they went in an ordinary
pace. I did not know that night that Judge Welch had been
killed." Now, as to whether the witness means by saying "they
went steadily away" from the scene of the homicide, that they ran
or walked, as stated above, becomes utterly immaterial. They left
the building together; they went there together. They went at a
time when no possible inference of innocence. could be attached to
either, at the dead hour of the night, walking together up to the
window, one of the two fired a shot into the house, the deceased
lying a few feet from the window; the mark of the weapon from
which the fatal ball was fired was impressed on the window blind
and on a direct line, as the witnesses testify, with the back of the
deceased and that the hole in his back was made by the bullet, the
bullet having passed probably through his heart.

The second ground of the motion complains that the court erred in
finding as a conclusion of fact that said Cayetano Pena and his
wife saw appellant and Sandoval run away hurriedly from the
window of Judge Welch's house. The last statement above made
answers this criticism upon the opinion of this court.

The third ground of the motion ·is that the court erred in its
conclusion of fact that "if the testimony of the witnesses is to be
believed as disclosed by this record, the motive for the killing was
political, and appellant and his codefendant were the hired assassins
of the political enemies of Judge Welch." Appellant insists that
this conclusion of the court is absolutely unsupported by and con-
trary to the record facts and urgently requests this court to set out
such of the testimony of the witnesses as this court considers to be
sufficient to prove that appellant was the hired assassin of political
enemies of Judge Welch. Appellant further submits that this court
has given a most lame and impotent reason for this finding of fact,
viz., because there is nothing in the record to suggest that appellant
and his codefendant had any personal animosity against the judge.
Appellant further states that upon reflection this court must see
the weakness of that position. This record contains something
over one thousand pages. The opinion in this case had to be
gleaned from over five hundred pages of statement of facts, and in
sheer deference to the fact that appellant .insists that the court erred
in its conclusion of fact that the motive for the killing was political,
will now state the substance of the evidence that we think suggests
the motive for this killing.. To do so in detail would make the
opinion unnecessarily prolix and tedious. The evidence shows that
appellant belonged to a political organization in the county of the
homicide at variance with that of the district judge whom he as-

sassinated. The party with whom Judge Welch and the district attorney affiliated and appellant's faction or party were each holding a political meeting on the night of the homicide. Judge Welch had been appealed to by one of the adverse factions to appoint part of said adverse faction deputy sheriffs to keep the peace on the next day, which was election day. This he positively refused to do. The record shows that after his death appellant, armed by some authority, marched by and stopped in front of the judge's office where he was killed, in company with many of his companions, about seventy of whom, if this record is to be believed, were armed. In fact, one bill of exceptions in this record complains of the action of the court permitting the State to prove this last fact. We did not mean to say, nor do we now state, as a matter of law, that the reason was political, but no other conclusion can be reached by the candid mind in reading this record other than the fact, as stated in the original opinion, that appellant was the hired assassin of political enemies, since the record discloses that appellant and the deceased were unknown to each other, or at least that they had no sort of bickering, misunderstanding or personal animosity one to the other. The record is replete with various circumstances showing the most intense animosity existing among the crowd that appellant ran with against the judge and his efforts, as he conceived them, to enforce the law. We are not here called on, nor are we attempting, to pass upon the justness of the insistence, nor are we intimating the illegality here of appellant's insistence from a political standpoint. With those matters we have naught to do, and care less. Therefore, if appellant had no personal animosity, conceding him rational—and no plea of insanity was interposed for him in this case—and the record being full and replete with suggestions of political animosity, the killing occurring at the dead hour of night, when the victim was asleep, can not be designated otherwise than as an assassination. Then the evidence showing to our minds conclusively that appellant committed the assassination, and political animosities being rife and manifest from a careful inspection of this record, we can not ascribe the motive to any other reason than as stated, and we reiterate and here state that it is apparent to this court that the basis and motive for this homicide and assassination was political. In addition to the above detailed facts we make this addition thereto as demonstrating a clear and rational basis for the conclusion stated in the original opinion, that the motive for this killing was political. Appellant and companion were seen at the meeting or headquarters of the political faction with which they affiliated and opposed by the faction with which the deceased affiliated before the killing. The deceased commissioned members of his side and had refused to authorize those of the opposing faction to act as police or go armed the following day—election day. Appellant and his companion were seen and talked to by Gonzales just after

the killing. Appellant claimed the shot was fired in the direction of headquarters of his faction while Gonzales said the shot was fired in the direction of deceased's room. That appellant then had a gun concealed, only the barrel of which could be seen by Gonzales during the conversation; that they separated, appellant and confederate going towards headquarters where he, appellant, was subsequently seen.

The fourth ground of the motion complains that the court erred in its conclusion of fact that after continued search appellant was sometime subsequently arrested in Old Mexico. The record shows, as appellant insists, that he remained in the county where the homicide occurred for sometime after the homicide, and that he did not leave there for Mexico until after the adjournment of the District Court of Starr County for its spring term, 1907. It is furthermore true that the principal witnesses against appellant, viz., Cayetano Pena, his wife and Jose Maria Gonzales, lived in Rio Grande City, the place of the homicide; but the record does show, and this is the only statement we were attempting to make, that appellant was captured after continued search in Mexico and extradited and brought back to Texas, he resisting arrest and doing all he could to escape being brought back to Texas. This is the only thought we meant to suggest and the only legitimate conclusion that could have been drawn from the statement in the opinion.

The fifth ground of the motion complains the court erred in finding that the trial judge committed no error in failing to charge on circumstantial evidence and in refusing to charge upon circumstantial evidence, and feels that when this court begins to discuss those cases and attempts to state just why they are not in point upon appellant's contention here, the court will reach the conclusion that it erred in its original finding upon this question of law. In the first place, as stated in the opinion rendered in this case on habeas corpus, 53 Texas Crim. Rep., 466, 110 S. W. Rep., 898, the court unanimously held that the testimony of the State is positive and unequivocal that relator in company with another killed deceased by shooting him through a window at night. We have reexamined all the authorities that appellant cites, together with a great many other authorities, and have no occasion now to change our opinion that this is not a case of circumstantial evidence. This case was tried by the court below under the guidance of the habeas corpus opinion which stated that the evidence was positive, and while we would not hesitate to reverse, if we thought we were in error, still after a thorough and careful review of all the authorities, we hold, as stated, that it is a case of positive testimony. In appellant's motion for a new trial he insists that none of the authorities cited support this court in the previous opinion. In the case of Polk and Watts v. State, cited in the original opinion, we have a

case, as we think, exactly in point with reference to the facts of this case. The dying declaration of the deceased covers all the salient features of the State's testimony, and from it we quote. After stating he went to a literary society at the church, he then says: "After the exercises broke up the two Parsons boys got company and started home, the balance of the boys, including myself, followed along behind them, so we could get together after they took the girls home. The reason why we did this was because we feared something would happen. After we left the church we saw three boys coming behind us, and we stopped to see who they were, and they passed us on the other side of the street, and I saw who they were. They were Austin Polk, Biz Watts and Mack Hughes, who had one eye. They walked on ahead of us for some piece, and after they had passed us they got on the same side of the street we were on, but kept ahead of us, and we saw them turn out of the road into some bushes, in a run, when they stopped. At this time we were about fifty feet from them, and I heard them snapping what sounded like a pistol. I told Mack not to shoot, that it was me. Mack jumped up and started to run, and as he did, all three of the boys commenced shooting. I could tell that Mack Hughes was shooting at me, but could not tell which way Austin and Biz were shooting, but think they were shooting at the Parsons boys. I was looking at Mack Hughes, and had been talking to him before he shot me. Mack Hughes was the one that shot me. I know this. There were several pistol shots fired. I don't remember how many though, but all the boys were shooting. At the time of the shooting it looked as if Austin, Mack and Biz were shooting at the Parsons boys, who were with the girls, as well as me and the boys who were with me." Now, the above is practically the State's case against the appellants Polk and Watts, the decision now under consideration. Mack Hughes was tried separately. The record does not show what was done with his case. Now, a casual reading of the above statement, and certainly a full reading of the decision last cited, will show that the deceased did not swear that appellants Polk and Watts shot him at all, but swears positively that they did not. The evidence further shows that it was dark. He had seen these two defendants go into the woods with Mack Hughes, and Judge Hurt found that it was not necessary in the trial of these two defendants to charge on circumstantial evidence, using in that connection the following language: "There was no error in omitting to charge upon circumstantial evidence. There was positive evidence of the parties participating in the main act, the killing; and, if not, the facts were in such close juxtaposition as rendered such charge unnecessary." See also Kidwell v. State, 35 Texas Crim. Rep., 264. The facts show that Judge Welch and the district attorney, Kleiber, were sleeping in a small, one-story house, each occupying rooms adjoining. The appellants walked up at the dead hour of night and one or the other shot into

the window inflicting a wound in the back of the deceased while sleeping. Now then, if the evidence had shown that this shot waked Kleiber up and he should have run into the room and discovered appellants walking "steadily away," could it be rationally insisted that the case would have been a case of circumstantial evidence? Certainly not, especially when the evidence of the two Penas is considered. Then the only difference between this condition and the record before us is that Kleiber did not enter the room immediately, but came within five or six hours or at least when he waked up in the morning and found the judge dead. Pena and his wife saw one of the parties shoot into the room. There was no one else in the room, and Kleiber, when he awoke, went into the room and found the judge dead. Would the fact that he went then instead of immediately render the case one of circumstantial evidence? Certainly not. Where the evidence shows that a certain party is sleeping alone in a room and another party is seen to approach said room at the dead hour of night, and fire into said room, the fact that his dead body is not found until the next morning does not per se make it a case of circumstantial evidence. Suppose Pena and his wife, after hearing the shot fired into the room and after appellant and his companion steadily walked away, said Pena and wife approached the house and found deceased lying on his cot dead. Would this have made it a case of circumstantial evidence? We apprehend not, and yet they could not swear they saw the bullet kill the deceased, but they could swear as Kleiber did swear that there was no one else in the room, and the physical facts show that the bullet which was fired into the window killed the deceased. But as stated in the original opinion, if these are circumstances only going to show the fact that deceased was killed by appellant, still the facts are in such juxtaposition to each other as not to call for a charge on circumstantial evidence. Appellant in his zeal insists on an impossibility of this court in that he suggests that we point out a decision exactly like the one here under consideration. The philosophic principle has been laid down by many courts that where the facts are in such juxtaposition one to the other as in this case, that the court does not have to charge on circumstantial evidence, and we apprehend with the utmost confidence in the statement that no court of last resort would hold the facts in this case warrant a charge upon circumstantial evidence.

So believing, the motion for rehearing is in all things overruled.

*Overruled.*

RAMSEY, JUDGE (dissenting).—Dissenting opinions are usually in vain, and for the most part useless. I am always reluctant to dissent from an opinion representing the deliberate convictions of my associates and heretofore, in the few instances in which I have found myself unable to agree with them, I have done no more than to

briefly note that fact with as brief a statement of the substance of my own opinion as possible, but the importance of the questions involved in this case and that decent respect for the opinion of the profession which every judge should entertain, have constrained me to set out at length the particular reasons upon which my own opinion is based. I am sure if I write with earnestness it will be understood that it is without disrespect to the opinion of the majority and is due to the strong opinions which I entertain. In my judgment, and as I read and interpret the law, the opinion of the majority overturns the ancient land marks of the law, is a departure from the settled rule in this court, and our Supreme Court for more than a half century, is wholly unsupported by any authority, and in the face of all the authorities and wholly without legal reason as a basis. If this opinion I so entertain is correct, I ought to dissent. As to whether I am right or wrong will be judged by the reasons given and authorities cited in this opinion.

What are the facts? Stanley Welch, Judge of the 28th Judicial District, was assassinated in Rio Grande City, Starr County, Texas, on the night of November 5, 1906. The general election at the time fixed by law was to be held on the next day, and there was and had been considerable political excitement in that section of the State, and particularly in Rio Grande City. The body of the lamented judge was found on the morning of November 6, between 7 and 8 o'clock. His death undoubtedly resulted from a gunshot wound, and he had apparently been dead for several hours when found. There was a bullet wound in his back, one in his breast and two wounds on his left arm evidently made by the same bullet. He was occupying, when killed, the south room of a two-room one-story brick house, the adjoining or north room being occupied by John I. Kleiber, the district attorney. To the east of the office building in the south room of which Judge Welch's body was found and at a distance of about 120 feet was a one-story building, one room of which was occupied by Cayetano Pena and Jesusa Gonzales de Pena, his wife. This last named house was situated upon a rise about seven feet above the elevation of the Welch house. The view from the two houses was practically unobstructed. There was no fence around the Welch house. To the north lay Third Street, 60 feet in width, upon the opposite side of which was what is known as the Priests' inclosure, occupying about a half block, and surrounded by a brick wall about seven feet in height. To the south of the Welch house were vacant lots and then a small jacal. The county courthouse is situated at the head of Britton Avenue, about 500 feet north of where Judge Welch was killed. The Catholic Church is diagonally across Britton Avenue, northwest from the Welch house, and facing south upon the corner of Britton Avenue and Third Street. Two political meetings were being held in Rio Grande City on the night of the assassination. One meeting was held at what is known as the "Red Corral" or

club, where the Democratic adherents were gathered and the other at the "Blue Corral" or club, where Independent and Republican forces were assembled. The former was held in what is known as the old courthouse and the latter in what is known as "Juan Hinojosa's inclosure." The Rio Grande River runs approximately east and west at the foot of Britton Avenue, south of the courthouse and Welch house. The cot upon which Judge Welch's body was found lying was directly in front of, and at a distance of from four to six feet from the east window of his room. The south room was separated from the north room by a brick partition in which was a white pine door with a transom over same. None of the witnesses knew, or even suspected, that Judge Welch had been killed until between 7 and 8 o'clock on the morning of the 6th of November. There is no evidence in the record to show any motive whatever on the part of either appellant or Jose Sandoval to kill Judge Welch, except as same may be implied by the circumstances. We think the inference is fair that his death was due to political animosity, though there is nothing to show any special reason that his death should have been sought by either appellant or Sandoval. There is no evidence to show that either of said parties was personally acquainted with Judge Welch, nor was there any evidence to show that appellant and Sandoval were acquainted with each other or had ever met prior to the night on which the Judge was killed. Sandoval lived in Mexico and was a citizen of that Republic. Appellant had lived in that section many years and the testimony indicates that he was an adherent of the opposition party to Judge Welch, though he was not specially prominent in it, nor was there a hint in the testimony of any words spoken by him or to him touching Judge Welch. It is simply shown that there was an intense feeling and hostility between the factions and that he belonged to the Independents and later the fact that Judge Welch was killed. The testimony upon which a conviction was sought, except a few wholly incidental circumstances, rests in the evidence of Jesusa Gonzales de Pena and her husband, Cayetano Pena. There are many contradictions between these witnesses. They contradict themselves repeatedly, their testimony is contradictory as same was delivered on habeas corpus trial, and on this trial they contradict themselves and contradict each other. Cayetano Pena was shown to have been charged and convicted of more than one offense growing out of the custom laws and his wife, Jesusa Gonzales de Pena, is shown to have been a witness of such dense ignorance and incapacity as to almost stagger belief. She testified that she did not know how old she was; did not know the date of the birth of any of her eleven children; did not know the date of her own marriage; did not know how many windows there were in the front of the house in which she had lived at the time of the murder for a year; did not know what year it was at the time she testi-

fied; did not know what month or day of the week it was upon
which she was testifying, and did not know the year in which the
shot was fired which killed Judge Welch. She also testified that
she did not know what north, south, east or west was; that she did
not know how to read or write, or tell the time by the clock or a
watch. Her testimony, however, on this trial was to the effect in
substance that on the night of the murder she and her husband
were in the house above described; that on that night between 11
and 12 o'clock her husband was sitting in the door in a chair
and she was sitting just back of him on the side of the bed; that
there was a light in their room; that it was a beautiful moonlight
night and that she could see from her door across to Judge Welch's
door, and could see him sitting inside his room in front of the
door; that there was a light burning in his room; that while she
and her husband were sitting there and while Judge Welch was
also sitting in his door, appellant and Jose Sandoval passed in front
and within six or seven feet of the door where witness was sitting;
that they were coming from the direction of the river, and were
going toward the north. Witness knew them both well; that they
passed along in front of the house, along the walk, and said noth-
ing. That sometime after these two men passed, Judge Welch's
light was extinguished and his door closed; that about an hour,
more or less, after they passed the first time, witness saw appellant
and Jose Sandoval coming from the same direction in which they
had come before, but before getting in front of her door they turned
off towards Judge Welch's office, and, walking upright and in a per-
fectly natural manner, walked to the window of Judge Welch's room;
that when they got to the window they stood close together a few
moments and then witness heard a shot fired, and that in a short
time after the shot was fired appellant and Sandoval walked off in
the direction of the priest's house. She did not know nor did she
indicate by any hint in the testimony which of the two men fired
the shot, though she testifies that the shot was fired at the east
window of Judge Welch's room; that she did not see that either
of the parties had a rifle or a pistol or arm of any kind on either
of the two occasions when she saw them; that she heard no other
sound, nor did she see the flash of any pistol or gun. She also
testified that after the firing of the shot she suspected nothing
wrong and did not know Judge Welch had been killed until she
was so told the next morning. She testified, as did her husband,
that they agreed that they would tell no one of the circumstances
of the night before because they were afraid to do so, nor did they
say anything about the fact to anyone until several months there-
after. Jose Maria Gonzales testified that he was living in Rio
Grande City at a place between Judge Welch's office and the Blue
Club; that he had been attending the two political meetings which
were going on on the night in question and went home about 12

o'clock and had partly undressed when he heard a shot in the direction of the Welch office and got up, dressed and walked out in the street near his house and met appellant and another man whom he did not know, coming from the direction where he had heard the shot; that appellant carried what witness took to be a rifle partly concealed under his coat. This witness had some conversation with appellant in which appellant said in substance that he was in the house at the time he heard the shot, drinking coffee; that witness saw these parties a block away, coming towards him; that they could easily have seen him and could have turned off at another street if they had so desired, but they came on toward him, walking at a natural gait, walked straight up to where he was in the street, and spoke in a perfectly natural way as they passed him, asking him in which direction was the shot. It was shown that a message had been sent to Mexico on November 5 for Jose Sandoval and the witness Clark saw him on this side of the river in Texas that evening about five miles from Roma; and he was on horseback and was at the time on the way to Rio Grande City. It was demonstrated to my mind by quite a number of circumstances that the shot which killed Judge Welch passed through the east window of his office entering the body in his back and causing his death. It is a fair inference, I think, from the entire record that the motive for this killing was political animosity due to the activity, as believed, of Judge Welch in respect to political differences between the two contending factions, and particularly to his refusal to grant the right to bear arms to the party of which appellant was a member. In this connection it should be stated that in a general way the testimony of Cayetano Pena supported that of his wife as to the movements of appellant and Sandoval as to the firing of the shot and their presence at the window when the shot was fired, and for the purpose of this discussion (whatever might be my own opinion as a matter of fact), it will be assumed that the evidence is sufficient to show that appellant and Sandoval were at the window of Judge Welch's house, and that one or the other of them fired a shot into said window. If this be true, and so much be conceded, two questions arise. First, whether or not, even if it be conceded that appellant fired the shot, it was a case of circumstantial evidence and should the court have given in charge to the jury an instruction in respect to that character of testimony? Second, the question whether while the evidence shows that one of the two parties committed the murder without showing which one of them and the other did nothing—that is committed no overt act and spoke no word as testified to by any witness—and that his connection and relation with the killing is to be gathered from his presence and other circumstances connected with the killing, was not a charge on circumstantial evidence required? It is well settled in this State where the case is one depending alone upon cir-

cumstantial evidence, the court must charge upon that character of evidence, whether requested to do so or not. Hunt v. State, 7 Texas Crim. App., 212-238; Howard v. State, 8 Texas Crim. App., 53-59; Ross v. State, 9 Texas Crim. App., 275; Ward v. State, 10 Texas Crim. App., 293-298; Barr v. State, 10 Texas Crim. App., 507-515; Robertson v. State, 10 Texas Crim. App., 602-610; Wright v. State, 12 Texas Crim. App., 163-169; Gonzales v. State, 12 Texas Crim. App., 657-664; Ray v. State, 13 Texas Crim. App., 51-56; Wyers v. State, 13 Texas Crim. App., 57; Harris v. State, 13 Texas Crim. App., 309-318; Lee v. State, 14 Texas Crim. App., 266-270; Dovelin v. State, 14 Texas Crim. App., 312-314; Cooper v. State, 16 Texas Crim. App., 341-344; Black v. State, 18 Texas Crim. App., 124-130; Puryear v. State, 28 Texas Crim. App., 73-79; 11 S. W. Rep., 929. It is as well settled that where the case is not dependent alone on circumstantial evidence the court is not required to charge upon that character of evidence. Tooney v. State, 8 Texas Crim. App., 452-463; Buntain v. State, 15 Texas Crim. App., 515-520; Hunnicutt v. State, 18 Texas Crim. App., 498-523; House v. State, 19 Texas Crim. App., 227-240; Smith v. State, 21 Texas Crim. App., 277-308. These general principles are so well settled that the propositions need no discussion, and the rule seems to be recognized in the majority opinion. That this was a case of circumstantial evidence, judged by the decisions of this court heretofore, we shall hereafter undertake to demonstrate.

None of the cases cited by the court in the original opinion herein were cases of circumstantial evidence and none of them are in point in support of the conclusion reached by the majority except the case of Beason v. State, 43 Texas Crim. Rep., 442, which sustains, as I believe, my position. All the other cases cited in the original opinion of the court were cases of direct testimony, and in not a one of them was the testimony circumstantial. To establish this conclusion let us review the cases. The first case cited, Dobbs v. The State, 51 Texas Crim. Rep., 629, was a case in which the wife of the appellant testified in express terms to the fact of the the killing. Indeed, it was not denied. The issue in that case was an issue of self-defense. We find in this opinion, written by Judge Brooks, this statement: "Appellant, however, insists the court erred in failing to charge the law of circumstantial evidence. Appellant's wife saw the difficulty, and testifies to the shooting of deceased by her son, appellant being present at the time." We have examined the original record and note that the statement of facts on this trial was returned, under the direction of this court to the court below, and we can not therefore do more than quote from the original opinion, but on the second appeal of this case, 54 Texas Crim. Rep., 550, 113 S. W. Rep., 923, wherein the opinion was written by myself, this statement appears: "Mrs. Dobbs had testified on direct examination that when the gun fired she was just north of

her house putting up some chickens; that she heard deceased say in a loud voice, 'Pap is going to swear lies on me about that land;' that she ran up to where she could see them, and, when she got within forty or fifty yards from where her husband was, she saw deceased jump out of the buggy and grab her husband's gun; that they scuffled over the gun a while, and it was finally broken, her husband retaining the stock and deceased the barrel of it, and then deceased raised the gun barrel as if to strike, when appellant said, 'Milt, don't let him kill me,' when the son fired." Thus it will be noted by an inspection of this case that Dobbs was an active participant in the encounter and that the act of the killing was in response to his invitation and by his procurement, and that this fact was testified to by an eyewitness. Of course, it is obvious that in this case no charge on circumstantial evidence was required. The next case cited is the case of Keith v. State, 50 Texas Crim. Rep., 63. That was not a case of circumstantial evidence and is not in point at all. Judge Davidson, who wrote the opinion in that case, gives a brief statement of the facts. I quote enough of it to show what was in his mind in passing on the issues raised therein: "The evidence shows that when appellant reached the residence, and after being introduced to deceased, they sat awhile conversing on the gallery. Appellant mentioned his mission; that he had come there, not for the purpose of talking with him about his family troubles, but to talk with him in a quiet and friendly way about his treatment of his, appellant's, mother. As soon as this statement was made deceased got up from his position, where he was sitting on a cot, and started in the direction of appellant, with his right hand reaching towards his pocket, where he had a knife, remarking, 'If that is your game, I will kill you,' accompanying the expression with an oath. Appellant told him to stand back; he did not want to hurt him; did not want any trouble with him; not to come on him. Deceased continued to come until he came to close quarters. Four shots were fired, and deceased was killed." In discussing the question of the necessity of a charge on circumstantial evidence, Judge Davidson disposes of the matter in this summary fashion: "We do not believe that the court erred in failing to charge on circumstantial evidence. *Appellant admitted the killing.* The circumstances place the two parties on the gallery together, and appellant in such close juxtaposition to the killing that, even without the confession, it would not, in our judgment, be a case calling for a charge on circumstantial evidence. He did all the shooting." The facts of the case in Kidwell v. State, 35 Texas Crim. Rep., 264, are somewhat obscure, but as we understand the facts, interpreted in the light of the companion case of Moffatt v. State, in the same volume, page 257, it is no more in point than the case we have just mentioned. In the course of the opinion, Judge Henderson, speaking for the court, says;

"The appellant in this case asked a charge on circumstantial evidence, and contends in that connection that, although the accomplice was present and *saw the killing,* yet, it being dark, and at the very time of the killing he being some little distance from the parties when it occurred, it was such a case as required of the court a charge on circumstantial evidence. The fact that the witness to the transaction was an *accomplice,* furnishes no reason why a charge should be given on circumstantial evidence, and at the time the fatal stroke was given he was so near and in such juxtaposition, though he may not have seen which one of the two parties inflicted the stabs and blows, several of which were fatal, yet, in the view we take of the case, it would make no difference, as to their guilt, which one may have caused the wounds." As above stated, the facts are not given in the Kidwell case, but in the companion case of Moffatt v. State, it is recited by the witness Lay as follows: "That after Pratt fell Moffatt and Kidwell came to where witness was standing, and said that *they* had killed Pratt. Kidwell had a dirk in his hand, carrying it with the point hanging down." So that it is obvious in this case that this was not a case of circumstantial evidence and has no sort of relevancy to the case under consideration here. The case of Holland v. State, 45 Texas Crim. Rep., 172, is still less in point. That was a burglary case. The evidence showed that one Schroeder, whose house was burglarized, had just left the room and closed the door, and that two or three minutes after this he went down stairs and his wife went up stairs to their room and he heard her scream. That when his wife reached the room she saw defendant in there. Here the fact that the door was closed is shown by positive testimony. The fact that the appellant entered the room and was in the room is shown by positive testimony. Appellant admitted being in the room, though he says the door was partly open and gave the explanation that he was looking for a closet. There is no discussion in this case further than a remark that the court did not believe the evidence was circumstantial as to the breaking, and hence it followed that the court did not err in refusing to charge on circumstantial evidence. The case of Polk v. State, 35 Texas Crim. Rep., 495, which is discussed at some length in the opinion on motion for rehearing is perhaps least, of all the cases cited, in point. There it unqualifiedly appears that the guilt of appellant was shown by positive testimony. Let us examine that case. Judge Hurt, speaking for the court, in the course of his opinion says: "There was *positive evidence* of the parties participating in the main act, the killing; and, if not, the facts were in such close juxtaposition as rendered such charge unnecessary." In the dying declarations of Rufus Jamison, the deceased, among other things, he says: "Mack Hughes was the one that shot me. I know this. There were several pistol shots fired. I don't remember how many though, but *all the boys were*

*shooting.* At the time of the shooting it looked as if Austin, *Mack and Biz* were shooting at the Parsons boys, who were with the girls, as well as *me* and the boys who were *with me."* So both the act of the shooting and the participation of all the parties in same was affirmatively disclosed by positive testimony, and this fact is expressly recognized by Judge Hurt, who was not likely to be mistaken in his opinion. Nor is the case of Adams v. State, 34 Texas Crim. Rep., 470, in point. That was a case of horse theft. The facts in the case, as briefly stated in the opinion, are that appellant was "seen by the witness Lowe on the day of the alleged theft, just outside of said pasture, near a road which led along the fence; and the defendant was just ahead of the colt, which seemed to be following him. He told said witness, as he passed him, that the colt had just jumped out of the pasture and that he was following him, and that he was going to drive him back. At some distance further on, in the same road, which led along the pasture fence, he was met by the witness Counts, and was then *driving* said colt along the road. Defendant offered to sell the said colt to the witness Counts. He told him that the colt had the distemper and that he had been riding him, and he was afraid it would not hold out to make the trip he was on." This is positive evidence, first, that when first seen appellant disclaimed any knowledge of the animal, and when seen a very short time thereafter he was driving the colt and set up a claim of ownership to it. More positive testimony of a taking could not well be imagined. It was not necessary in order to make the evidence of the taking positive that anyone should have actually seen him put his good right hand on the horse's mane and put a rope around him, but the facts are shown by positive testimony that the property did not belong to him; that when first seen he recognized this fact and stated he was going to drive the colt back, and that at some distance further on in the same road, he was met by another witness who saw him driving the animal and heard him in person set up a claim of ownership to the colt. There is no discussion by Judge Hurt in this case, but he disposes of the claim and contention that the court erred in not charging on circumstantial evidence in this language: "If said colt had jumped out of the pasture, as stated by appellant, said witness Lowe saw him at or about the time *he was in the act of taking possession* of the colt, and the witness Counts met him in a very short time thereafter. But if it be conceded that no witness saw him in the very act of taking possession of said colt, yet the testimony places defendant in juxtaposition to the main fact, which is the act of taking in this case, so that the omission to give the charge on circumstantial evidence was not calculated to injure defendant's rights." The next case referred to, Baldwin v. State, 31 Texas Crim. Rep., 589, is very brief, nor are the facts stated. Judge Davidson wrote the opinion

in that case, and among other things, says: "The failure of the court to charge the jury in relation to the law of circumstantial evidence, if error at all, is not of sufficient importance to require a reversal. The missing hogs were tracked a short distance from the place at which they were taken, and discovered in the possession of defendant and his brother, who were driving them, and who drove them on home and butchered them. While no witness saw defendant actually take possession of the hogs, yet the criminative circumstances are in such 'juxtaposition to the main fact' that the omission to give the charge was not calculated to injure defendant's rights." The next case referred to, Crews v. State, 34 Texas Crim. Rep., 533, was a case of positive testimony. That was a case of murder, and is well briefed by both counsel for the State and defendant, and seems to have received more than usual attention both by counsel and the court. Judge Henderson in that case says: "While it is true in this case that no witnesses testify that they saw the act of killing, yet the facts and circumstances of this case are of a character to place defendant in such proximity and juxtaposition to the fact of killing as to render such a charge unnecessary, and besides, the statements of deceased and Mrs. Crews were in the nature of *positive evidence.*" The whole facts taken together show, beyond the shadow of a doubt, that the evidence was positive and true, as the following statement will show: "The little boy in the house heard his mother, just before she received her death wound, cry out to Crews not to shoot, and the father, as soon as they went to him, as a part of the res gestae, when asked who did it, *said that it was Crews,* and that he robbed him, and rode off on his horse Joe; and he was seen a short time thereafter, near the scene of the homicide, riding the deceased's horse, with his gun." So that here is the spontaneous cry of a little child testifying to the declaration of his mother in her extremity and just before she received her death wound, crying out to Crews not to shoot, and the father, who was also killed at the time, spontaneously stating as part of the res gestae that it was Crews who did the killing. There can be no doubt that this was a case of positive testimony. Nor is the case of Bennett v. State, 32 Texas Crim. Rep., 216, in point. That also was a case of positive evidence. Let us examine the record. The opinion is quite brief, nor are the facts given at any length, but in paragraph three of the opinion, written by Judge Simkins, this statement was made: "The court did not err in failing to tell the jury that this was a case wholly of circumstantial evidence. The evidence was *direct and positive* as to appellant's guilt, as testified to by an *eyewitness,* and if the shooting was not seen, the facts were in such close' juxtaposition to the shooting as to be equivalent to direct testimony. The charge as given was sufficient." The case of Hardin v. State, 8 Texas Crim. App., 653, is still less in point.

Judge Clark, who wrote the opinion in that case, among other things, states: "The evidence in this case is not *wholly* circumstantial in a legal sense. The presence of the defendant at the scene of the theft, and his *active confederation* with the actual thief, were established by evidence of a *positive nature.* The rule as to circumstantial evidence has not yet been extended to a case of that character." These are all the cases cited in the majority opinion, except the case of Beason v. State, 43 Texas Crim. Rep., 442. With the reasoning of that case, nor as to its conclusion we have no complaint to make, nor do we differ from it in any respect. The opinion in the case is written by Judge Brooks and contains intrinsic evidence of the most careful consideration and is in clear accord, as I believe, with my views, and if the doctrine applied in that case is to obtain here, under my view, this case should be reversed. The following lengthy quotation from the opinion in that case is a better statement of my views than I could myself write: "It has been held that a charge on circumstantial evidence is necessary only when the case rests 'solely' and 'alone' upon circumstantial evidence. The construction of the word 'solely' or 'alone' has been repeatedly construed in this State by every court of last resort, and the decisions of this State have been followed with approval by the courts of other jurisdictions. The rule is this: That it is only necessary where the main fact, or, as one case puts it, 'where the gravamen of the offense,' or, as another case has it, 'where the act of the crime,' rests solely upon circumstantial evidence, that then it becomes a case known as a case of circumstantial evidence requiring a charge upon that. In the Buntain case, 15 Texas Crim. App., 515, Judge White used the following language: 'If a court were required to charge the law of circumstantial evidence in all cases where reliance was had upon circumstances to establish any particular fact, then, indeed, there would be but few, if any, cases in which such a charge would not be required; but such is not the rule. A charge upon circumstantial evidence is only required where the evidence of the main facts essential to guilt is purely and entirely circumstantial.' In the Hanks case, 56 S. W. Rep., 922 (opinion rendered by this court), in reference to whether or not positive evidence of uttering a forged instrument, where the indictment was for the forgery, was sufficiently direct to lift the case out of the realm of circumstantial evidence, the following language was used: 'We are aware of the rule, and we adhere to the same that when the main fact constituting the gravamen of the offense is proved by direct testimony, and the intent merely with which the act was done is proven by circumstantial evidence, a charge on circumstantial evidence will not be absolutely necessary.' But perhaps the best case in point is Jones v. State, 34 Texas Crim. Rep., 490. In this case the discussion of the principles applied to burglary is involved. At the risk of being prolix, but in

order that the same may be made clear, we quote copiously from that case: 'Mr. Starke, in his work on Evidence (section 862), says: 'The force of circumstantial evidence being exclusive in its nature, and the mere coincidence of the hypothesis with the circumstances being, in the abstract, insufficient, unless they exclude every other supposition, it is essential to inquire with the most scrupulous attention what other hypothesis there may be which may agree wholly or partially with the facts in evidence.' The court in Beaver's case said: 'We can conceive of no hypothesis by which, in the order of natural causes and effects, the facts proved can be explained consistently with the innocence of the prisoner; and this is the true test of circumstantial evidence. It excludes all reasonable doubt of the prisoner's guilt.' 58 Ind., 530, 537. 'But this principle applies only to proof of the act, and not to proof of the intent. Accordingly, in a case of burglary, an instruction which contained the following sentence was properly refused: 'Where a criminal intent is to be established by circumstantial evidence, the proof ought to be not only consistent with the defendant's guilt, but it must be wholly inconsistent with any other rational conclusion than that of the defendant's guilt.' The court said: 'This rule is proper when the act which is claimed to be criminal is sought to be established by circumstantial testimony. But when the act is proved by direct testimony, and all that remains to be found is the intent which accompanied the act, and which may be inferred from the circumstances accompanying the act, then this principle does not apply.' In the reversal of this case upon its former appeal this court said: 'Now, while it is true a confession to the burglary would take the case out of the rule, yet a confession to theft alone, under the circumstances of this case, would not make the charge of burglary a case of positive evidence. The possession of the corn recently after it is stolen would only be a circumstance pointing to the burglary, for the corn may have been stolen, and yet no burglary have been committed.' See Woolridge v. State, 13 Texas Crim. App., 443; State v. Calder (Mont.), 59 Pac. Rep., 903; Leeper v. State, 29 Texas Crim. App., 154. Therefore it is clear that, where the act constituting the main essential fact of a crime is testified to by direct evidence, it is not a case of circumstantial evidence. But where the main fact or the act constituting the crime is shown by indirection, it is a case of circumstantial evidence, although the intent may rest upon positive proof. What is the main fact or the act of a crime in a case of burglary? In murder it is the fact of the homicide; in theft it is the act of the taking; in burglary it is not the intent with which it is committed, it may be with the intent to commit the crime of theft, robbery, rape, murder, or any other felony. The main essential fact of burglary is the breaking and entering of the house. The commission of the crime intended when the house was entered need

not be executed, and yet the crime is complete. Martin v. State, 1 Texas Crim. App., 525. In this case, both upon this trial and upon the former appeal, no human eye saw, nor did a human lip testify to, the actual breaking of the house alleged to have been burglarized. That it was broken and entered depends solely upon inferences and deductions. It was arrived at by the method of exclusion. True, appellant pleaded guilty to the theft of the corn; but what was the effect of his plea? It was merely an admission of all the facts alleged in the complaint and information charging theft. 'A plea of guilty,' says Mr. Bishop, 'is a recognition of whatever is well alleged in the indictment.' Crow v. State, 6 Texas, 334; Doans v. State, 36 Texas Crim. Rep., 468."

The facts of the case last cited are more fully set out in the opinion on the first appeal which will be found in the 43 Texas Crim. Rep.; 442, 2 Texas Ct. Rep., 921. The syllabus in that case briefly states the facts, which, as I believe, are much stronger than the facts of this case. This syllabus is as follows: "Where in a prosecution for burglary there was no positive evidence as to the entry by breaking, the fact that the defendant had pleaded guilty to theft committed in the alleged burglary and stated that he would turn State's evidence against his codefendants and that he knew enough on them to send them to the penitentiary, did not amount to a confession of the burglary, and it was error to refuse a charge upon circumstantial evidence." It was also shown in that case that the property taken from the burglarized house was soon thereafter found in the possession of Beason, and it is stated as a reason why the charge on circumstantial evidence should have been given that the fastenings were of a flimsy character and evidently such as might be blown open by the wind, or, the house, being an outhouse, some person might in the meantime have pushed some of the doors open and so left them, and because the State's evidence showed that after 12 o'clock on the night in question one of the doors was open.

These are the cases and all the cases cited in the majority opinion, and we submit that it will appear by reference to the brief resume of each case, and more clearly by an inspection of the original opinion that none of them are cases of circumstantial evidence, except the case of Beason v. State, supra, which was twice reversed because the court did not give a charge on circumstantial evidence. The opinion of the court, too, as we conceive overlooks this distinction. In the cases where it is said there was such juxtaposition in respect to the offense charged as to relieve the court of the necessity of a charge on circumstantial evidence, the nearness of the defendant was shown both in respect to the place of the homicide, as well as the time at which the offense was committed. Here the body of the deceased and his death was not discovered for many hours—six or seven at least—after the firing of the fatal shot as testified to by the witnesses. It is not shown except as an inference that the

deceased was in the room when the shot was fired. It is shown that he was in his room a short time before the firing of the shot and it is shown that his dead body was lying on his couch many hours thereafter. It is not shown that the persons who fired the shot in the window knew the exact spot where he slept or could see his body or knew they had killed him. While the circumstances may point, as I believe they do, very strongly to the fact that he was shot through the window on the east side of the house, after all, strong as the evidence is, it can not be denied, I think, that it was circumstantial. It is not the weakness or strength of the testimony which required the court to give a charge on circumstantial evidence, it is the character of the testimony and not its quantum, and whether in any given case the evidence is weak or strong does not in any sense change the rule. This is abundantly demonstrated and sustained by all of the authorities. It will be unnecessary to quote many of them. We shall make liberal extracts from a few of the cases so as to illustrate our views and support our position. Among the earliest cases is that of Puryear v. State, 28 Texas Crim. App., 73. In that case our brother Brooks had the honor to be counsel. The testimony of the State rested largely upon the evidence of Essie Puryear. After stating that the appellant was the father of the child and that no one was present or lived in the house except Puryear, she then states: "On the morning of the 13th day of March, A. D. 1888, I gave birth to a child; it was near daylight and no one was present but defendant. I told him before the birth of the child that I couldn't stand it by myself, but he said I could stand it without some one as well as with them. While I was giving birth to the child the defendant pressed on my knees, and he delivered the child. There were three rooms to my house, one room being upstairs, and two downstairs. The child was born downstairs in the front room. After he delivered the child he went to the fireplace to get a string to tie the cord. The baby cried, and I called the defendant to come and tie the cord. He then came and took the child upon his left arm, and took it out of the room into the side room, and I heard him pouring water on something, and then he came back into my room, and I asked him where the child was, and he said he had it 'out there all right.' I asked him where, and he replied, 'out there in the water.' The defendant then made up a fire, went into the side room and returned with the child between some wood. I saw it, and asked him what he was going to do with it, and he said he would burn it. He then put the wood and baby into the fire, and I said, 'Oh, John, don't do that.' The child did not make any noise, and had made none since he had carried it out of the room. I had heard him pouring the water out in the side room after he took the child out there. When defendant threw the child and wood in the fire, and I said, 'Oh, John, don't do that,' he did not make any reply, but turned

towards me and smiled. I was flooding at the time, was very weak, and said nothing else about the child at the time. After a little I told defendant to get me some water—that I was flooding. He kept a large fire all day, and kept the door shut and the window curtains down. It was a warm morning, and defendant was in his shirt sleeves. His shirt was patched at the elbow. The shirt was originally blue, but had faded until you could not tell its color. He kept this shirt on until Sunday morning, when he pulled it off. He got some blood on the left sleeve of his shirt close to the wrist." Here was juxtaposition, presence, participation, everything except that the witness was in one room and the child was in the other at the time of the murder, but a moment intervening; it lacked nothing of being positive evidence except to see the bloody murder with her own eyes, and yet in that case it was held that a charge on circumstantial evidence should have been given. In the course of the opinion Judge Hurt uses this language: "It will be readily perceived that if killed at all the child must have been drowned or burned to death, the circumstances tending strongly to show that its death, if it was killed, was caused by drowning. If drowned, we have a case resting purely upon circumstantial evidence. If burned to death, we have a case of positive evidence—assuming that the child was living when placed on the fire. If it was not living when placed on the fire, then the theory that it was burned to death is not in the case except as the fact that the body was thus disposed of may tend to show express malice. assuming that defendant had murdered the child by drowning it.

"Back then to the question as to the methods by which the child was killed. If drowned, then a case of circumstantial evidence. The facts demonstrate this proposition. Being a case of circumstantial evidence, the rules applicable to such a case should have been given in charge to the jury. This was not done, though such instructions were prepared and requested to be given by counsel for defendant. This was error, unless it is absolutely certain that the child was burned to death. Was this the case? By no means, for the proof tends more strongly to show that it was drowned. Essie Puryear does not state that the child was living when placed on the fire. If the child was living when placed on the fire this fact is established by circumstances, and hence we have a case of circumstantial evidence upon either theory relied upon by the State. But let us concede for the argument that the circumstances—the facts—were in such juxtaposition that they amount to positive proof that the child was burned to death, still the theory that it was drowned might have been adopted by the jury, and the defendant convicted upon that theory, without proper instructions upon the rule applicable to a case depending upon circumstantial evidence." This case has been frequently referred to with approval and was in express terms

approved in the case of Leftwich v. State, 34 Texas Crim. Rep., 489. Another case illustrating the same view is that of Trejo v. State, 45 Texas Crim. Rep., 127, 74 S. W. Rep., 546. To insure accuracy we quote from the statement contained in the opinion, the substance of the criminating testimony. It is as follows: "Celestina Aguillar states that she knew defendant and deceased; that defendant came to her house about 2 o'clock on the morning deceased was killed, and asked her to open the door, which she refused. He then forced his way into the house, grabbed, and tried to slap witness, and for a little while was striking at witness. She caught him, and held him, and heard two or three persons approaching the house. Deceased came to the door, knocked, and said, 'Celestina, Celestina,' and defendant did not want witness to answer, and was angry. She told him that her mouth was her own, and that she would answer. Deceased opened the door, came in and asked for a drink of mescal. Defendant raised the mosquito bar, and stood up. She informed deceased she had no mescal, and defendant told deceased to get out of the room, in an angry voice; and deceased kept asking for mescal. Defendant then went to the door, stood, and said to deceased, 'You stay with the whore; she has her customers that visit her at midnight;' and then took his departure. Deceased remained in the room, asking for a drink. Witness begged him to leave, informing him that defendant was a very bad man; she knew him well, and that he would return and do some injury. Deceased went to the door and told some one outside to go away, that he was going to stay; and witness entreated deceased to leave also. Finally deceased concluded to leave, and went out of the door. Witness immediately shut and tied the door with a rope which defendant had cut. She was very sleepy, having been up two nights without sleep, and had come in on the train from Mexico, and immediately threw herself on the bed and went to sleep. She was aroused by a pistol shot near the window where her bed was situated. She got up from the bed, and saw defendant at the window. He remarked to her, 'Hist, Celestina, be careful not to say that I did it.' Smoke was coming in through the shutters of the window. She did not see any arms about defendant. He had changed his coat since he had left her house and before the shooting. Upon his making the remark to her he went away. Witness aroused her daughter, who began blowing the police whistle. After blowing the police whistle, witness De La Rose and Rodriquez came to the house and asked what had happened, and witness informed them that defendant had fired a shot." Here there was motive, jealousy, anger, a pistol shot, the smoke of a pistol in the presence of the defendant, and a dead man, with but slight suggestion that the murder could have been committed by anybody else and putting Trejo in close juxtaposition to the murder, both with respect to time and place, with the strongest possible evidence of motive. Yet, the witness did not in fact see the shot fired and the

man killed. It lacked only this of making the testimony positive and not circumstantial. On this question our present presiding judge uses this language: "It is also seriously contended that the case was one of circumstantial evidence, and exception is reserved because the court did not charge the law applicable.to this character of case. Where an issue in a case is left in doubt by the evidence, that doubt should always be solved in favor of the accused. If the presumption of innocence and reasonable doubt mean anything, it is of a peculiar force at this particular point. The facts should never be resolved in favor of guilt or against reasonable doubt by the trial court in submitting a charge upon the law. While it is true that the circumstances may be so close and cogent, throwing the accused in such juxtaposition with the main fact that it may not require a charge upon circumstantial evidence, yet, when the facts are in doubt upon this theory, it is the safer and sounder rule to charge in regard to circumstantial evidence. In order to justify the trial court in not charging upon this phase of the law, it must be ·taken as certain, first, that the witness Aguillar testified truthfully, and, growing out of that, secondly, that appellant was at the window as testified by her, and, thirdly, that his remark to her was a confession to the killing. While these conclusions of the court may or may not be proper deductions from the testimony, still we do not believe it of sufficient cogency to exempt it from the rules of circumstantial evidence, or bring it within the rules of positive evidence to the exclusion of the law of circumstantial evidence. Upon another trial the court should . give this phase of the law." If the doctrine is correct, as is stated, that the facts should never be resolved in favor of guilt or against reasonable doubt, by the trial court in submitting a charge upon the law, on what theory or by what reasoning appellant was denied a charge on circumstantial evidence in this case is not apparent. Again, take the case of Guerrero v. State, 46 Texas Crim. Rep., 445, 80 S. W. Rep., 1001. The facts in that case and the opinion in respect to them are thus stated by Judge Davidson: "A serious question in the case is the omission of the court to charge the law applicable to circumstantial evidence. Witness Will McCombs, nephew of the alleged owner, testified that while riding in the Irvine pasture he heard four shots, and after a short interval of time another. After hearing the five shots, he hitched his horse, and walked half a mile to near where he heard the shots. He came in sight of defendant hanging up a pig in the fork of a mesquite bush some two and a half or three feet high. Witness hid in the brush. After hanging the hog up, defendant went in the direction of witness, and when within about fifty yards worked the lever of his gun several times. He did not stoop down or pick up anything from the ground. He then passed within about ·thirty steps of witness, and went in the direction of his home. Witness examined the pig and recognized it as his uncle's. The pig weighed about thirty pounds. He informed his

uncle of these matters, and they returned to the Irvine pasture, where, the alleged owner testified, he found the hog hanging in the fork of the mesquite bush. It was dead, and was killed by a gunshot. From this point they trailed a track. The sheriff arrested appellant the following day, and en route to jail carried him to the point designated by the witness McCombs, and there fitted the shoe appellant was wearing in the track found upon the ground, which corresponded exactly. How long it was between the cessation of the four shots, as mentioned by witness Will McCombs, and the firing of the fifth shot, or how long after the firing of the fifth shot before he hitched his horse and went in the direction of where he heard the shots, is left to conjecture. The distance is stated to be about one half mile. Coming in sight of appellant, witness stopped, and recognized him as being the man he saw hanging the hog in the mesquite bush. It is further shown that the hog was shot, and that appellant had a Winchester with him. There is unquestioned evidence also that there was a Mexican at appellant's residence, who wore a shoe corresponding exactly with that worn by appellant. This evidence is from the State's witnesses. It is contended by appellant that this case depends purely upon circumstantial evidence, and required the court to submit that phase of the law. The State contends that the facts placed appellant in such close proximity and juxtaposition that the court was justified in not charging this phase of the law. There are some authorities in this State which sustain the State's contention. But we are of opinion that the facts of these cases place the relation of the accused more nearly to the immediate act relied upon by the State than does the testimony in this record. While the fact that appellant was seen hanging the hog in a bush and that he had a gun, and that the hog was shot, might be cogent circumstances tending to prove his guilt, yet it is a deduction and must be an inference from these facts that would justify the jury in concluding he shot the pig. We are therefore of opinion that the facts were not of sufficient cogency in their nearness and proximity to the immediate transaction to relieve the court of the duty of charging the law of circumstantial evidence." Especially noticeable is the following language in this opinion: "While the fact that appellant was seen hanging the hog in a bush and that he had a gun, and that the hog was shot, might be cogent circumstances tending to prove his guilt, yet it is a deduction and must be an inference from these facts that would justify the jury in concluding he shot the pig."

On the general proposition that the whole case here, and this without reference to who fired the fatal shot, makes it a case of circumstantial evidence under the authorities, could be demonstrated, as I believe, by the citation of innumerable authorities, but the language and facts of the cases cited above would seem to be sufficient to support the correctness of my opinion. But there is even stronger ground upon which the court was required to submit a charge on

circumstantial evidence, and that rests on this theory: In this case there is no pretense or claim or hint of any statement that appellant and not Sandoval fired the shot which killed Judge Welch, if they did kill him. The statement is that one of them fired a shot through the east window of his residence. Which one? Can the court say? Should not the jury be left free to determine this fact under the evidence? If it be true, as our learned presiding judge says, that our whole criminal jurisprudence rests and must be construed with reference to the presumption of innocence and the doctrine of reasonable doubt, should it not rather be assumed that Sandoval fired the shot, in submitting the law of the case? Was appellant not entitled to a submission with reference to the presumption in his favor, and not on an assumption conclusively assuming the worse state of affairs against him? Is it not evident that in a case where it is absolutely in doubt which of two parties fired the shot that the case is no stronger against appellant than if the positive testimony had showed that Sandoval did the shooting? Or if this much can not be conceded, is it not evident in any event that in submitting the law of the case, appellant was entitled to a charge based on the theory most favorable to him and which would authorize the jury in the event they found this theory to be true to apply the undoubted law to the facts of the case? Is this not more clearly demanded where there is no evidence or motive except one of political hostility shared by hundreds of people in common with the person charged? Ordinarily in determining whether a case is one of circumstantial evidence, it has been found that it was only one person charged and but one of the elements suggested above entered into the question. Ordinarily the only question is, was the shot the cause of the death and appellant's connection with the shot shown by positive testimony and was he the person shown to have been guilty of a criminal act? In this case both the questions occur. In the first place, in addition to the question that whoever fired the shot, the facts showing the killing, are not positive, but if appellant did not actually fire the shot his complicity rests alone on circumstantial evidence. Let us assume that the jury might have found that Sandoval fired the shot. Then how is appellant's guilt shown? There is no suggestion in the testimony of these Mexicans that one word was spoken by these parties. That the person who did not fire the shot raised his hand or his voice, or did one act or made any possible demonstration. If appellant did not fire the shot, then his guilt rests upon these circumstances: that he belonged to a political party adverse to the deceased; that he was seen in the hostile camp with Sandoval about 11 o'clock; that he was twice seen at the house of Cayetano Pena late that night; that he was traced to the window of the deceased and was later seen by Gonzales walking along the public street, with such additional force as the jury might lend to the circumstances of his open

departure for Mexico six months after the tragedy. It is not to be denied that these circumstances are indeed strong if the testimony of Cayetano Pena and his wife is to be believed. But that the testimony is circumstantial is to my mind so demonstrably clear as to not admit of doubt. On this question fortunately we are not without the benefit of the learning of many courts, and especially decisions by this court, so clear and so conclusive as that no man ought to be able to err. Among the controlling cases and the most recent one, is that of Early v. State, 50 Texas Crim. Rep., 344, 97 S. W. Rep., 82, in which the opinion was written by our brother Brooks. In that case Jack Early and Harmie Horn were indicted for the murder of one Terrell Calloway. I want to contrast and put, as it were in parallel columns the facts of the two cases. In that case Horn and Early were close friends. In this case appellant and Sandoval were strangers. In that case Early and Horn were together, not only on the night of the homicide, but were together from early in the afternoon. In that case threats were shown by Early against Calloway. In this case not a word was spoken hostile to the deceased. In that case bitter enmity and hatred were shown on the part of Early towards Calloway. In this case they were strangers. In that case Early was shown on the ground where the fatal difficulty occurred. In this case the same fact was proved. In that case there was an immediate flight. In this case appellant stayed for six months near the scene of the homicide, and when he did leave there was no secret of his going. Not only this, but the witnesses say in the Early case that two men were seen near where Calloway lay. Let us quote the record: "Nelson had retired and gone to sleep, and was aroused by a noise on the outside. The first thing he heard was some one saying, 'That will do; let him up.' He then looked out of the window, and saw the bulk of men out some distance from the office, one standing up and another in a low position. The man standing up was moving about a little and he could tell that it was a man. The other object in the low position he could not tell whether it was one or two men at that time." The evidence in this case showed, as the record puts it, that Calloway had been literally cut to pieces. The evidence in respect to the weapons was as follows: "Appellant and Horn were each shown to have owned a large spring-back knife, with blades three or four inches long." Again, we find the following statement fixing Early undoubtedly on the scene: "Appellant was shown to have worn on the night of the difficulty a hat with a yellow leather hat band." The evidence further shows that the struggle extended over a space of ground twenty or twenty-five feet in length and from four to eight feet wide. And further that the leather hat band of appellant was found upon the ground where the evidence of the struggle was shown. This further statement appears in the record: "The feeling of appellant toward deceased was one of malice, bitterness,

and hatred." This statement also appears: "On the very night of the difficulty, while appellant and Harmie Horn were at the depot, waiting to take the train for Axtell, they had a conversation with John Stirman, in which conversation appellant used this language: 'We don't like Calloway. He has not treated us right.'" The evidence in that case further shows that at the time of the difficulty Horn was in an advanced state of intoxication and raises some presumption that his condition was such as to render it unlikely that he had inflicted all the injuries found on Calloway's body. In that case it was urged that the court should have charged on the law of circumstantial evidence and in passing on this assignment, Judge Brooks says: "The evidence for the State shows appellant was at the scene of the homicide. This is made manifest by circumstantial evidence as well as by appellant's confession. But there is no *positive* testimony of any guilty *participancy* by appellant in the homicide. Appellant expressly disclaims any participancy, and the fact that he assisted in the commission of the crime, if established, is by circumstantial evidence alone. This being true, it was the duty of the court to charge the law of circumstantial evidence. Jones v. State, 34 Texas Crim. Rep., 490, 30 S. W. Rep., 1059, 31 S. W. Rep., 664; Puryear v. State, 28 Texas Crim. App., 73, 11 S. W. Rep., 929; Riley v. State, 29 Texas Crim. App., 105; Trejo v. State, 45 Texas Crim. App., 127, 74 S. W. Rep., 546; Beason v. State, 43 Texas Crim. App., 442, 67 S. W. Rep., 96, 69 L. R. A., 193; Crowell v. State, 24 Texas Crim. App., 404, 6 S. W. Rep., 318." It will be noticed that the opinion contains the expression that "appellant expressly disclaims any participancy" in the difficulty, but it is manifest that this disclaimer could have no effect on the issue in question as to whether the law of circumstantial evidence should have been given in charge. Where the State's evidence is circumstantial unless the killing is admitted by a defendant the court must charge the law in respect to circumstantial evidence. How can it be contended that the disclaimer of appellant or the character of his testimony can change the law, unless indeed he admits the killing, when he may not and is not required to testify at all? The test must be with reference to the incriminating circumstance, and if the evidence of the State is circumstantial and the appellant produces no testimony, the law of circumstantial evidence must be given in charge. His plea of not guilty is a denial of everything and is in itself a disclaimer as complete and perfect as testing the character of charge to which he is entitled as if he had gone on the witness stand and in terms denied the killing. A careful review of the Early case, supra, has convinced me that it is a more direct case of positive testimony than the case at bar, and how it can be held that the Early case must be reversed on account of the failure of the court to charge on circumstantial evidence, and yet in the Cabrera case, held that a charge on circumstantial evidence is not required

to be given and is a case to be affirmed, is something that I confess with, I hope becoming humility, and certainly in all candor, that I do not understand. If in the realm of mind and morals a theodolite could be constructed with needle as fine as "the spider's most attenuated thread," no finite mind can draw a possible distinction between the two cases to the disadvantage of the appellant here. The holding of the court in the Early case was not new. Judge Brooks was but following the decisions of this court and our Supreme Court from the time when both he and I were infants in arms, and as authority for his action refers to and reaffirms the Puryear case, supra. It is the universal rule that where on a trial for homicide the evidence of the accused's presence at the scene of the crime was, aside from such presence, circumstantial and his participation in the crime was established by circumstantial evidence alone, the refusal to charge on circumstantial evidence is erroneous. Among the early cases on this question is that of Burrell v. State, 18 Texas, 713. That opinion, concurred in by the surviving members of our old court, John Hemphill and Royall T. Wheeler, who with Judge Lipscomb were the Dii Majores of our judiciary, judges worthy to rank with Mansfield, Hardwicke and Holt, of England, and with Marshall, Cooley and Sharkey, of our own country, a court that had added luster to our civilization, and whose decisions have been the inspiration, as they have been the foundation, of most that is good in the annals that have followed them. If we might imagine the time when MacCauley's traveler from New Zealand should stand on London Bridge and view the ruins of Saint Paul, the virtues, as the performances, of these men will stand in vigor unabated and in glory unobscured. The opinion in this case by Judge Wheeler is the same doctrine and the same rule contended for by Judge Brooks in the Puryear case, and later laid down by him in the Early case. What are the facts? James Burrell and James R. Burns were jointly indicted. The evidence shows, in brief, that these parties came to the house of Elizabeth Ewell, in San Felipe, on the day of the homicide and were served with dinner; that while at this house Bird, the deceased, came in and some conversation ensued in which *Burns* asked Bird if he was about to travel, to which he replied that he was, and then asked him which way he was going, and Bird replied up the country towards La Grange, and *Burns* said, "We are going that route," and invited Bird to go with them, and suggested that they travel together, which seemed to be agreeable. It seems about 3 o'clock the next morning Bird was brought back to her house wounded, and made to Mrs. Ewell a dying declaration from which we quote the following: "On the Saturday following, she asked Bird who shot him; he said James Burrell shot him, and then said, Come close to me and I will tell you all about it; he said, 'We had no quarrel; he, Bird, was riding behind; *they* said, 'Ride up, Bird, don't be afraid;' he rode

up; one said, 'Are you armed?' 'No, I never pack arms.' One said, 'Defend yourself,' and as he turned his head Burrell shot him (about seven miles above San Felipe, near the cross timber in Austin County). Bird died about the 15th of August, 1854. On the Thursday that Bird was so happy, he asked them if they would not believe what a dying man would say. Bird said he told the men he was traveling with, his name; and they told him their names; the names they gave were James Burrell and James Burns. Bird said, when he was shot he wheeled his horse and ran towards San Felipe and fell off his horse. He said a stream of blood ran out of his mouth when he was shot; said the two men joked each other as if they were strangers; talked about the country as if one of them had just arrived. I know Bird said James Burrell shot him." It appears by the testimony of other witnesses that Bird made use of the following language: "I shall die and *two* men riding with me shot me." Again, the following appears from the testimony of Woodson F. Washam: "Bird was sensible; knew me; said he thought he should die; said Burrell and Burns shot him." The last two expressions to the effect that Bird had declared that the two men had shot him, in the light of the opinion of the court, must have been construed as to be a mere opinion or conclusion of the witness and that his statement to Elizabeth Ewell that James Burrell shot him was the correct statement of the actual transaction. Burrell and Burns traveled together and were found together after the homicide. Now, here we have the fact of Burrell and Burns being together when Bird appears; deceased, Bird, travels with them at Burns' request; Burns is present when the shot is fired and the man is killed; Burns continues with Burrell after the homicide and is found with him more than once thereafter. His presence at the time of the homicide is shown. That Bird was with them when he was killed at Burns' invitation is abundantly established by positive testimony. Both Burrell and Burns were tried together; they were both convicted. As to Burns an instruction on the law of circumstantial evidence was requested and refused. The judgment of conviction as to Burrell was affirmed and that as to Burns was reversed for the reason that the court did not give, as it should have given, a charge on the law of circumstantial evidence. The opinion of Judge Wheeler in that case is so clear and convincing on this question that we insert it entire: "But it is not so clear that there is not error both in the refusal of instructions, and in the charge of the court in reference to the case of the defendant, Burns. If he be guilty, it is as a principal in the second degree, being present, aiding and abetting the commission of the homicide. To constitute the crime, of which the evidence tends to convict him, there must have been a participation, on his part, in the act. If he was cognizant of the intention of his codefendant, and being present, was consenting, and it was but the carrying out of a common de-

sign, he is guilty equally with him who committed the deed; and upon this subject the general principle is correctly stated in the charge of the court. But in order to implicate him in the crime, he must have been aware of the intention of his companion to commit it. His bare presence is not sufficient. For 'although a man be present whilst a felony is committed, if he take no part in it, and do not act in concert with those who committed it, he will not be a principal in the second degree, merely because he did ·not endeavor to prevent the felony, or apprehend the felon.' (Roscoe Cr. Ev., 213; Whart. Am. Cr. L., 6364; Whart. L. Homicide, 157.) Whether he was aware of the intention of his companion and participated in it, was the fact to be proved, in order to implicate him in the criminality of the act. That as to him, was the factum probandum, upon the proof of which his conviction must rest. And as to that, the evidence was wholly circumstantial. There was no positive proof that he was aware of the intention of his companion, or that he committed any overt act at the time, manifesting a criminal intention on his part. His presence was not, of itself, sufficient to inculpate him. It was not, per se, evidence of guilt, or of any force as proof, only as considered with other circumstances conducing to prove his guilt. It was not the main fact to be proved; for, of itself, it did not imply any criminality. But his presence and companionship, and his conduct at and before and after the commission of the act, were circumstances from which the main fact of his participancy in the criminal intention and design of his companion was to be inferred. It is plain, therefore, that as to his guilt, the evidence was wholly circumstantial. Although joined with the other defendant upon the trial, he was entitled to a distinct consideration of the evidence in his case, and to have the law applicable to it given in charge to the jury. All the instructions asked respecting the legal tests of the sufficiency of circumstantial evidence to warrant a conviction were refused; and the charge of the court did not affirm in any distinct proposition, or embrace in substance the instructions refused; or inform the jury what is the proper test of the sufficiency of such evidence. The fifth and twelfth instructions were rightly refused; the former, because not correct in the abstract; and the latter, because of the assumption which it contains, that there was no evidence in the case tending to show that Burns was privy to the intention of Burrell. The first and second, though not liable to the same objections, and though expressed in the language of a learned and philosophical elementary treatise, were not well adapted to the comprehension of a jury; and we do not hold that it was error to refuse them, in the form in which they were propounded. Mr. Starkie and other elementary writers have undertaken to define, and doubtless have defined with all the precision and accuracy the subject is susceptible of, the tests of the legal sufficiency of circumstantial evidence. But it is finally

admitted that the circumstances which will amount to sufficient proof of a disputed fact can never be previously defined. In their nature they can never be matter of general definition. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of the jury. (1 Greenl. Ev., sec. 2; 1 Stark. Ev., 514; 14 Texas R., 514.)" Other authorities might be cited, but these seem to be sufficient.

There is another error in the record, as I believe. On the trial counsel for appellant requested the court to charge the jury as follows: "That the mere presence of the defendant at the time and place of the killing (if he was present) would not justify you in finding him guilty of the offense charged, unless the State has satisfied your minds by competent evidence, and beyond reasonable doubt, that he, the defendant, knowing the unlawful intent of the party committing the act, aided him by acts, or encouraged him by words or acts to commit such offense. And it would devolve upon the State to prove such acts by competent evidence, beyond a reasonable doubt, before you can convict this defendant upon such evidence." This charge, I think, under the facts of this case should have been given. That the mere presence of the defendant at the time and place of the commission of an offense will not justify the jury in finding such defendant guilty of the offense in question as a principal, unless the evidence shows beyond a reasonable doubt that such defendant, knowing the unlawful intention of the party actually committing the act, aided him by acts or encouraged him by words or acts to commit such offense, is not only elementary and reasonable and sufficient within itself, but is abundantly established by the following authorities: Schulee v. State, 35 S. W. Rep., 375; Leslie v. State, 42 Texas Crim. Rep., 65, 57 S. W. Rep., 659; Red v. State, 39 Texas Crim. Rep., 667, 47 S. W. Rep., 1003; Mitchell v. State, 36 Texas Crim. Rep., 278, 36 S. W. Rep., 456; Franklin v. State, 76 S. W. Rep., 473; Parks v. State, 79 S. W. Rep., 537; Faulkner v. State, 43 Texas Crim. Rep., 311, 65 S. W. Rep., 1093; Chapman v. State, 43 Texas Crim. Rep., 328, 65 S. W. Rep., 1098; Renner v. State, 65 S. W. Rep., 1102.

As stated in the brief memorandum filed by me at the time the original opinion was handed down, it is not certain but that there are other errors for which the case should be reversed, but this opinion is already so long that I forbear to discuss the other questions. I do not need to say that the personality of the appellant in this case has not to the extent of a hair's breadth affected or influenced my decision. He is no more to me, nor I to him, than Hecuba was to Hamlet's players. I am concerned alone in the law and its proper administration. It is the pride and glory of our law, it ever has been, and let us hope it ever will be, that all men are equal before the law. One law and one Lord over all. I do not believe that appellant has been tried and convicted in accordance with law

and therefore feel constrained to enter my dissent and to set up the ancient and well settled principles of the law as I have learned them from the master builders of our profession.